## MILLER v. FOLSOM.

No. 6122.    Opinion Filed June 22, 1915.

Rehearing Denied September 21, 1915.

(149 Pac. 1183.)

1. **DEEDS—Inadequacy of Consideration—Mental Incapacity—Sufficiency of Evidence.** Where, in a suit to set aside a deed on the ground of fraud and mental incapacity to execute it, the evidence discloses that plaintiff had just reached his majority; that he was a Choctaw Indian of average intelligence for one of his age and quantum of blood; that for some time prior thereto he wanted to sell his allotment to keep the money out of the hands of his guardian for fear he would appropriate it to his own use, and to get the money himself and have a good time on it; that before arriving of age he had executed a deed thereto to B. for a recited consideration of $2,500, with the understanding that he was to get $1,100 and a house and lot, and on the same day executed to him a lease in the name of another as lessee, whereupon B. paid him a small sum of money, and the conveyances were a sham to enable B. to be in a better position to buy the land when plaintiff became of age; that defendant met plaintiff with a deed conveying his allotment prepared for his signature and acknowledgment, and bought the land from him for a consideration of $1,250, which was paid, whereupon, having signed, he acknowledged the deed after the nature and effect of the transaction had been explained to him by the notary; that, on the same day, in the presence of a field clerk with the Interior Department, defendant offered to rescind the transaction and return the deed if plaintiff was dissatisfied therewith and

would return the purchase money, which he refused to do after the nature and effect of the transaction had been explained to him by the field clerk, and that plaintiff knew nothing of the values of land or other property—**held** that the evidence did not reasonably tend to show mental incapacity on the part of the plaintiff sufficient to set aside the deed. **Held**, further, in the absence of fraud, or undue influence, that inadequacy of consideration was not sufficient for that purpose.

2. **DEEDS—Execution—Test of Mental Capacity.** The test of capacity to make a deed is that the grantor shall have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting. To invalidate a deed it must appear that the grantor was incapable of comprehending that the effect of the deed, when made, executed, and delivered, would be to divest him of the title to the land set forth in the deed.

(Syllabus by the Court.)

*Error from District Court, Choctaw County;*
*Summers Hardy, Judge.*

Action by Grover C. Folsom against C. W. Miller. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*I. L. Strange,* for plaintiff in error.

*Charles E. McPherren, Charles B. Cochran,* and *Works & Copping,* for defendant in error.

TURNER, J. On May 8, 1913, Grover C. Folsom, defendant in error, in the district court of Choctaw county, sued C. W. Miller, plaintiff in error, to set aside a warranty deed, conveying to said Miller, on May 5, 1913, his allotment in that county, on the ground of fraud and his mental incapacity to contract. After answer filed, in effect a general denial, there was trial to the court and a general judgment for plaintiff that the deed "should be canceled and set aside on account: First, of the incompetency of the said Grover C. Folsom; and, second, because of the grossly inadequate consideration paid for

the said conveyance"—whereupon the deed was set aside as prayed, upon terms, and defendant brings the case here.

We say this is a general judgment, in keeping with plaintiff's contention, for the reason both sides concede, and the record discloses, that at the close of the testimony on December 17, 1913, the court rendered and entered judgment as stated. On December 19th defendant filed motion for new trial, and on December 20th, without request of either side, the court made and filed special findings of fact and conclusions of law, and thereafter overruled the motion for a new trial, thereby failing to give either side an opportunity to except to his findings of fact and conclusions of law. We will therefore not consider them, but will treat the judgment as a general judgment in favor of the plaintiff.

In setting aside the deed on the grounds stated, the court in effect failed to find any fraud in its procurement on the part of the grantee, and it is not urged by either side that any existed. After a careful examination of the evidence, we can find none, and so that feature may pass out of the case. But the court in effect found that plaintiff was without mental capacity to make the deed in question, and set the same aside on that ground. Plaintiff in error assigns that such finding is not supported by the evidence, and of this we will now inquire. On this point there is no conflict. The evidence discloses that plaintiff is a mixed-blood Choctaw and had reached his majority on the day before he executed the deed assailed, which conveyed his allotment to defendant; that he had theretofore been under guardianship, but did not like his guardian very well, owing to the fact that he thought his guardian was trying to take advantage of him, which seems not

to have been without foundation. While not living with his guardian he attended school, worked on a farm and in a drug store at odd times, perhaps 12 months in all, and thereby earned about $100, which he spent for clothing and trifles. He was also a newsboy on a train. In all he attended school about six or seven years at Armstrong Academy. He wrote a good hand, and completed his ninth grade there, and, just before he was of age, bought a half interest in a rooming house at Hugo, for which he agreed to pay $500. All the witnesses who testified on the subject state, and the court finds, that he seemed to be as normal as any other Indian of his degree of blood. Ever since receiving his allotment, the evidence discloses, he wanted to sell it, for two reasons: First, to keep the money out of the hands of his guardian for fear he would appropriate it to his own use; and, second, to get the money and have a good time on it. Accordingly, on February 8, 1913, he executed a deed to the land to one Bronaugh for a recited consideration of $2,500, with the understanding that he was to get $1,100 and a house and lot, and on the same day a lease to him was taken in the name of one Simmons for five years for a consideration of $40 for the first year. On March 17, 1913, he mortgaged it to Bronaugh in the name of his father-in-law, Moseley, for $1,500. All of which was a blind to enable Bronaugh, by paying plaintiff some money, which he did, but not much, to be in a better position to buy the land when plaintiff became of age. On February 13, 1913, he executed a mortgage thereon to one Snow for $500, perhaps in payment of his half interest in the rooming house. A few days before becoming of age, and while sitting in the rooming house with Snow, the latter suddenly arose and said: "Let's go to Ft. Smith; there goes

the train now"—whereupon they arose and caught the train and left and went, not only to Ft. Smith, but to other points in Arkansas and other states. On the trip they had a good time on Snow's money, plaintiff being without funds. It seems that the object of the trip was to keep plaintiff out of the hands of Bronaugh and others, who were seeking to get a deed from him to his allotment and play him into the hands of parties other than defendant, who wanted to do the same thing. Upon returning to Ft. Smith on their way home, they met one Cook, connected in some way with the Indian service and perhaps acting under instructions from Mr. Bozarth, field agent for the Interior Department, located at Hugo, who took plaintiff in charge. About that time defendant, a real estate dealer well informed as to land values in that country, and who was in the habit of buying cheap land whether he had seen it or not, learning in some way that plaintiff was in Ft. Smith, prepared a deed for his allotment and went to that city. There he met plaintiff and Cook, whereupon Cook turned plaintiff over to defendant, with instructions to turn him over to Mr. Bozarth, which, undertaking to do, they got on the train and started for Hugo. Up to that time plaintiff had received $490 on his land from Bronaugh and, still being anxious to sell his land, proposed to defendant that he buy it for $1,250, which he did, whereupon plaintiff signed the deed which is sought to be set aside. After that defendant wired ahead for a notary public and left the train at Goodland, where they met him. The notary swears, and it is undisputed, that he first explained the nature and effect of the transaction to plaintiff and, after he had thoroughly understood it, took his acknowledgment and later thereto affixed his seal. Upon their arrival at Hugo they went

to defendant's office, after plaintiff had deposited the purchase money in the bank, from whence defendant sent for Mr. Bozarth and, in the presence of plaintiff, told what had been done, after which he requested Mr. Bozarth, in effect, to take plaintiff apart and advise him, and that if plaintiff then wanted to rescind, he would take back his check, given for the purchase money, and return plaintiff his deed. This Mr. Bozarth did, but the trade was not rescinded, because plaintiff refused to do so, and expressed himself satisfied therewith. Right along here plaintiff testified:

"Q. Do you know whether when you sold your land for $1,250 you got what it was worth? A. No, sir. Q. Why did you agree to take that for it? A. I was told that was all it was worth. Q. Who told you that? A. Miller. Q. If that was true and when Mr. Bozarth told you it was worth $4,000 and Miller said he was willing to trade back, why didn't you trade back; you heard Mr. Bozarth's testimony? A. Yes, sir. Q. You heard him say that Mr. Miller called him over there and told him he had taken a deed from you and had given you $1,250, and if Mr. Bozarth had any objection to it, and you would give him back his money, he would give you back your deed, and Mr. Bozarth told you $4,000 was better than $1,250? A. Yes, sir. Q. He told you you could get $4,000, did he? Why didn't you give him his money back and wait and get your $4,000? A. I didn't know for sure whether I could get it. Q. You told Mr. Bozarth you thought your guardian would get it and wouldn't let you have it, and you could get $1,250 in cash? A. I told him I was afraid my guardian would get it and wouldn't give it to me."

After that, on the same day, he fell into the hands of Bronaugh and, when confronted with the fact that Bronaugh had advanced him $490 on the expectation of getting the land, he seemed worried and, although it was

Miller v. Folsom.

a cold day, sweat profusely and cried. When asked if he had made a deed to his land to defendant, he admitted that fact with reluctance. Bronaugh swore that he could not say that plaintiff was drunk, or that his mind was wrong, but that he was terribly worried. The result of the interview was that plaintiff gave Bronaugh a check for $490 on the purchase-money fund. The next morning, however, plaintiff stopped payment on the check, and left Bronaugh to get his money as best he could. It is unnecessary to enter into the details as to how plaintiff squandered the money received in payment for his land. It is sufficient to say that, at the time he received it, he had made arrangements to get married, and had selected the furniture for a house and had paid for it before stopping payment on the check, as aforesaid. In short, owing to his mismanagement, the fund soon dissipated, so that he received very little benefit therefrom. He was examined at length to test his intelligence. We have read the testimony and are convinced that nowhere in this entire record is there evidence reasonably tending to prove that he was not of a contracting mind or that he was not of mental capacity sufficient to make this deed, or did not know the nature and effect of the business he was transacting. When asked if defendant had given him any money that day for the land, he answered:

"A. He gave me a check. Q. Check or check-book, which was it? A. It was a check. Q. Do you know the difference between a check and a deposit slip? A. A deposit slip is a slip the bank gives you when you make a deposit. Q. Do you think he gave you a check? A. I know he did. Q. Did you go to the bank with him? A. Yes, sir. Q. He went and saw that you put your check in the bank? A. Yes, sir. Q. That you got a deposit slip and checkbood? A. Yes, sir."

But the court was impressed with the idea that he knew nothing about the values of property, and this because plaintiff himself said so. On that point he testified, in substance, that he knew nothing of the value of horses, cattle, or real estate at any particular time. And the court in his findings of fact, which we refer to for the sole purpose of showing the drift of the mind of the court, found that, at the time of the transaction involved here, he had no conception of the value of his land or the value or use of money, and that his lack of experience and business training made him liable to be imposed upon by designing persons, and, further:

"* * * That the plaintiff, Grover C. Folsom, is incapable of, and incompetent to, manage his business affairs. That he is grossly ignorant of the value of property and of the value of real estate and of money, and that he is such a person that it is probable that he would make an improvident disposition of his property, and he is such a person as would likely be unduly influenced by designing persons who might gain an influence over him."

This is the most that can be said in favor of the holding of the court that plaintiff was without mental capacity to make the deed sought to be set aside. There is no evidence of fraud, undue influence, or duress; neither is there any of drunkenness, peculiarities of conduct, or delusion, or hallucinations, or even weakness of mind. This is manifestly insufficient to set aside the deed. 13 Cyc. 573, says:

"A deed may be void by reason of mental incapacity on the part of the grantor. In order, however, to render a deed void on this ground it should appear that the grantor was laboring under such a degree of mental infirmity as to make him incapable of understanding the nature of the act, the test being not merely that the grantor's mental powers were impaired, but whether he

had sufficient capacity to understand, in a reasonable manner, the nature and effect of the act which he was doing. In determining the question whether a deed is void because of the mental incapacity of the grantor, his mental ability at the time of the execution controls, and if he possesses sufficient capacity at that time the deed will be valid."

In *Paulter v. Manuel et al.*, 25 Okla. 68, 108 Pac. 753, quoting approvingly from *Allore v. Jewell*, 94 U. S. 506, 24 L. Ed. 260, we said:

" * * * It may be stated as settled law that, whenever there is a great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside."

It seems that what is meant by "understanding the nature of the act," is that the grantor must be incapable of comprehending that the effect of the act would be to divest him of the title to the land set forth in the deed. In *Doe d. Guest v. Benson*, 2 Del. (Houst.) 246, the Chief Justice charged the jury:

"If, from age, or disease, or the visitation of providence, or from any other cause, no matter what, his mind was so unsound as to render him incapable of comprehending and understanding the nature and character of the act he was doing, and the consequences, in respect to himself and the estate, * * * if consummated, would be to divest his estate and interest in the land, then we say to you that he was of unsound mind, according to the legal significance of these terms, and the deed would be void on this ground."

In *Jones v. Thompson*, 5 Del. Ch. 374, the test is stated thus:

"In cases of alleged want of mental capacity, the test is whether the party had the ability to comprehend, in a reasonable manner, the nature of the affair in which he participated. This is the rule in the absence of fraud; for fraud, when present, introduces other principles. 8 C. E. Green, 511. This ability so to comprehend necessarily implies the power to understand the character, legal condition, and effect of the act performed."

And in *Eaton v. Eaton*, 37 N. J. Law, 108, 18 Am. Rep. 716, thus:

"The test of capacity to make an agreement or conveyance is that a man shall have the ability to understand the nature and effect of the act in which he is engaged, and the business he is transacting. He may be old; he may be enfeebled by disease; he may be irrational upon some topics—but, in the absence of fraud and imposition, he may still execute a valid deed, or other disposition of his property; but if the mind be so clouded or perverted by age, disease, or affliction that he cannot comprehend the business in which he is engaging, then the writing is not his deed."

See, also, *Harbison v. Lemon*, 3 Blackf. (Ind.) 51, 23 Am. Dec. 376; *Hay v. Miller et al.*, 48 Neb. 156, 66 N. W. 1115.

In *Beaty v. Hood*, 229 Ill. 562, 82 N. E. 350, Beaty filed a bill to set aside his deed to Hood, on the ground of mental incapacity to make it. The proof disclosed that he made the deed in execution of a trade with Hood. Among other things it was sought to prove that the grantor's mental capacity was such as to disqualify him from transacting or understanding ordinary business. He failed to recover. In summing up the evidence on this point, the court said:

"On the question of mental capacity of plaintiff in error, Dr. Palmer, his family physician, testified he had known him several years, and was acquainted with his mental condition about the time the deed was made; that he considered his business judgment bad as to values in making trades; that he did not think he had any conception of trading values; that he was capable of transacting ordinary affairs of life, such as buying and selling property, but that in all the trades he knew of him making plaintiff in error lost; that he was rational enough so far as laboring and coming and going was concerned, but was erratic, irritable, and changeable in his views and ideas of values; that he understood how to manage and conduct his farm and raise crops, but the witness did not think his mental capacity good in buying and selling. The witness further testified that these conditions had existed about 15 years, during which time plaintiff in error managed and conducted his business of farming, buying, and selling stock, and had sufficient capacity to know the effect of his act when he signed the deed and comprehended the effect of a conveyance to him, and that as to the condition of land and soil he thought the judgment of plaintiff in error normal."

The holding of the court in affirming the case is indicated in the syllabus, which reads:

"To justify setting aside a deed upon the ground that the grantor was weak-minded, the proof must show that he was so mentally unsound as to be incapable of understanding the nature and effect of the transaction and of protecting his own interest; and it is not sufficient to show that he was not a good judge of land values nor capable of making discreet trades."

And so we say that the court erred in its view that mere ignorance of the value of his land is sufficient to disqualify plaintiff from making a deed thereto, and is an indication of mental incapacity. If he was as ignorant of values as the court inferred, the most that can be

said is that plaintiff might be likened to one who becomes. the owner of a precious stone of unknown value to him, and who sells it for a small part of its value without informing himself of its actual worth. It goes without saying that he must suffer the result of his own folly, and that a court of equity will not aid him to recover the property, for the reason that he was chargeable with the duty to inquire of its worth before making the sale. Plaintiff also might be likened to one who is the owner of a field containing a treasure under its soil, of which he was ignorant. It cannot be said that equity will set aside his deed, conveying it to one who had purchased it without fraud or undue influence for a small part of its value. Throughout this entire record not one witness testified that, in his opinion, plaintiff was, in the least degree, of unsound mind or without mental capacity to make this deal. On the other hand, numbers of witnesses. testified that they had known plaintiff from his youth up, and that, in their opinion, he possessed that capacity. In the light of all the testimony we can find no evidence reasonably tending to support the allegations of mental incapacity or fraud or undue influence. That he well understood the nature and effect of the transaction is. evidenced by the testimony of the notary, who took his. acknowledgment. His testimony is uncontradicted. After testifying to meeting plaintiff and defendant, he said that defendant handed him a deed and told him he had bought plaintiff's land and wanted him to take plaintiff's acknowledgment; that he took the deed in his possession and asked plaintiff if he had signed the deed and if the signature thereto was his. The witness then testified:

"And he told me it was—and then I explained to him the transaction as near as I could, that is, to the

effect that he had made a deed to Mr. Miller to his land for $1,250, and that he understood he was selling that land to Mr. Miller and it was gone and asked him if he understood that, and he said he did. He was rather talkative, talked to me about his trip that he had been on over in Arkansas, laughed about the good times that he and Snow had had, and where they had been and talked a great deal about the transaction.  *  *  * "

For the reason that we think plaintiff was of sufficient mental capacity to make the deed, and that the evidence fails to reasonably tend to support the view of the trial court, there being no evidence of fraud, we have little concern in the consideration which went to support the deed. It might be said, however, that the land was testified to be, by some of the witnesses, of a value ranging from $15 to $20 per acre up to $50 per acre; that the court determined its value to be of the latter amount, which may or may not have been right; that whether it was or not we need not say, for the reason that, in the absence of fraud, this point may be disposed of in the language of *Black v. Post*, 67 W. Va. 253, 67 S. E. 1072, where the court said:

"Having ascertained that the grantor had sufficient capacity to dispose of her property, which is the point on which plaintiff chiefly relied, and the one upon which the overwhelming amount of testimony seems to center, it goes a long way towards disposing of the other charges of inadequacy of consideration and fraud in the procurement of the deed. Inasmuch as the law gives a person an unqualified right to dispose of his property as he pleases, even to the extent of giving it away, it necessarily follows that inadequacy of consideration is not alone· sufficient to overthrow a deed. It is only evidence to be considered along with other facts and circumstances bearing on the charge of fraud in the procurement of the deed."·

Or, as we said in the syllabus in *Bruner et ux. v. Cobb et al.,* 37 Okla. 228, 131 Pac. 165:

"Whenever it appears that the parties to a trade have knowingly and deliberately fixed upon a price, however great or however small, there is no occasion or reason for interference by the courts, for the owners have the right to sell property for what they please; but where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the fact of fraud."

We are therefore of opinion that the court did wrong to set aside the deed complained of, and for that reason the cause is reversed and remanded for a new trial.

All the Justices concur; except HARDY, J., disqualified.