## CHANNELL et al. v. JONES et al.

No. 25913.    April 18, 1939.

John Adams, for plaintiffs in error.

W. S. Lowther, H. M. Adams, and Henry S. Johnston, for defendants in error.

OSBORN, J. This action was instituted in the district court of Logan county on April 18, 1933, by Della Jones and other heirs of A. D. Channell, deceased, hereinafter referred to as plaintiffs, against Arch Channell, Raymond Channell, and other heirs of A. D. Channell, deceased, Cora Channell, wife of Arch Channell, and C. A. Sanderson, hereinafter referred to as defendants. The purpose of the action was to cancel certain conveyances of real estate and to quiet title thereto in plaintiffs. The property was originally owned by A. D. Channell, who died in November, 1929. The title asserted by plaintiffs to said property arises by virtue of their heirship to said deceased. The title claimed by defendants arises by virtue of a tax deed to them from Logan county, and a quitclaim deed from A. D. Channell, deceased, executed during his lifetime. Defendants also claim title by prescription. Plaintiffs prevailed in the trial court. The tax deed and quitclaim deed were canceled and there was a judicial determination of the heirs of A. D. Channell, deceased, and title to the real property involved herein was quieted

in said heirs and a general accounting was ordered. From said order and judgment, defendants Arch Channell, Cora Channell, and Raymond Channell have appealed.

The tax deed was canceled for the reason that it was void on its face. It was held that the quitclaim deed was void on account of the mental incapacity of the grantor. Defendants' claim of title by prescription was denied for the reason that the prescriptive period did not run during the disability of A. D. Channell.

Defendant Sanderson claimed certain mineral interests in the land by virtue of a mineral deed from Arch Channell. At the conclusion of plaintiffs' evidence he interposed a demurrer which was sustained upon a statement by plaintiffs' counsel that no recovery was expected from him. He is not a party to this appeal. It therefore becomes unnecessary to give further consideration to his interest.

At the conclusion of the evidence the trial court entered extensive findings of fact and conclusions of law. The findings of fact are fairly supported by competent evidence. With slight modification, the facts hereinafter stated are those found by the trial court.

A. D. Channell, the ancestor of the parties herein involved, and his wife, Arthula Channell, homesteaded the northwest quarter of section 33, township 17 north, range 4 west, in Logan county in the year 1889 or 1890. Improvements were erected on the south eighty acres, but the north eighty was not improved. In February, 1907, Arthula Channell obtained a divorce from A. D. Channell and was awarded the south eighty acres. We are here concerned with the north eighty acres, which consists largely of pasture and timbered land; only about thirty acres of this tract being in cultivation.

A. D. Channell was committed to the State Hospital at Norman on May 19, 1900. Between that date and January 18, 1906, he was committed to that institution four more times, and in January, 1918, he was committed for the sixth and last time. In March, 1918, he escaped from the institution and was never returned nor discharged. From the date of his first commitment to the hospital A. D. Channell did but little work on the farm. For some considerable time following the date of the divorce, he had no fixed place of abode. He lived a portion of the time on the north eighty acres, sleeping in a brush thicket or in an adjacent schoolhouse; at times he worked in the vicinity of Crescent at his trade, that of a stone mason. For four years prior to the year 1917, he rented out a portion of the north eighty acres and collected the rents. The pasture land on the north eighty acres was connected with the pasture land on the south eighty acres and the entire pasture was used for the benefit of the stock of the Channell family. During this period of time A. D. Channell lived a portion of the time with a son, Richard Channell, who ran a small shoe repair shop at Crescent, Okla.: while there he did some watch and clock repairing.

On January 24, 1917, Arch Channell, Raymond Channell, and Richard Channell, sons of A. D. Channell, obtained a tax deed to the north eighty acres. Later Arch Channell purchased the interests of Richard and Raymond Channell. At that time no immediate change was made in the improvements, fences, or cultivated land. Shortly thereafter Richard Channell and Raymond Channell were drafted into service in the United States army and A. D. Channell was committed to the hospital at Norman, from which he escaped on March 6, 1918. At the close of the war Richard Channell again opened his shop in Crescent and A. D. Channell again made his home there a portion of the time. Arch Channell was married in 1920 and for the next several years lived on rented farms in the vicinity of Crescent, but did not use or cultivate any of the homestead. Two orphan grandchildren of A. D. Channell cultivated the north eighty acres for two years and paid the rent to Arch Channell, otherwise, from the years 1917 to 1927, the entire north eighty acres was used, cultivated, treated, and farmed for the purposes of the Channell family.

On January 3, 1927, an application for a hearing to "have the fact of A. D. Channell's restoration to capacity judicially determined" was filed in the county court of Logan county. The hearing was held on this application on January 12, 1927, and the court made an order purporting to declare A. D. Channell sane and to restore him to capacity. It is interesting to note some of the circumstances surrounding this hearing. The parties present were E. W. Aniba, Arch Channell, Raymond Channell, C. A. Sanderson, and A. D. Channell. A hearing was had at 10 o'clock on January 12, 1927, and within an hour and a half after the hearing had been held, A. D. Channell had executed a quitclaim deed to the property involved herein to Arch and Raymond Channell and the instrument filed for

record; an oil and gas lease on the property from Arch and Raymond Channell to C. A. Sanderson, dated January 3, 1927, also had been filed for record. E. W. Aniba, partner in the real estate business with Sanderson, appeared as attorney for A. D. Channell at the hearing, as a witness at the hearing and as the notary public who acknowledged A. D. Channell's signature on the application for the hearing and on the quitclaim deed, and likewise acknowledged the signatures on the oil and gas lease. Arch Channell and Raymond Channell received $800 for the oil and gas lease and out of said sum paid their father A. D. Channell $500 as the consideration for the quitclaim deed.

The record discloses a warranty deed dated August 12, 1922, executed by Richard Channell and Myrtle Channell, husband and wife, to Arch Channell and Raymond Channell, conveying to them their interest in the land herein involved.

The record also shows a warranty deed dated March 22, 1928, from Raymond Channell and Zola Channell, husband and wife, to Arch Channell conveying to him their interest in the premises herein involved.

It appears that in the spring of 1928 Arch Channell constructed a house upon the premises and occupied the same as his home.

Section 9402, O. S. 1931, provides as follows:

"A person entirely without understanding has no power to make a contract of any kind, but he is liable for the reasonable value of things furnished to him necessary to his support or the support of his family."

In the case of Connecticut General Life Ins. Co. v. Cochran, 95 Okla. 111, 218 P. 313, it was held:

"Where a grantor in a deed is incapable of comprehending that the effect of the deed when executed and delivered would be to divest such grantor of title to the land described in such deed, said grantor is as to such deed entirely without understanding within the meaning of Section 4981, Comp. St. 1921 (sec. 9402, O. S. 1931, 15 Okla. St. Ann. sec. 22), and the deed is void and conveys no rights to the grantee or subsequent purchasers or incumbrancers in good faith."

See, also, Grayson v. Brown, 166 Okla. 43, 26 P.2d 204; Micco v. Replogle, 175 Okla. 617, 53 P.2d 1093; Canfield v. Canfield, 167 Okla. 595, 31 P.2d 149; Miller v. Folsom, 49 Okla. 74, 149 P. 1185.

Dr. D. W. Griffin, superintendent of the State Hospital at Norman, qualified as an expert witness and testified in behalf of plaintiffs that he had known A. D. Channell since the date of his first commitment to the hospital in 1900, and had observed and treated him at intervals from that date to the year 1918. He was diagnosed as an "early involution psychosis; he had many delusions, particularly those of grandeur. * * *" The doctor stated further that his condition was a chronic progressive one; that there was no possibility of improvement; that at the date of his last commitment, he had advanced in mental deterioration due to hardening of the arteries. The witness testified further that at no time during the period in which he knew him did Channell have the mental capacity to transact business or to understand or carry on commercial transactions involving lands or real estate, or to pass on business affairs.

The acts and conduct of A. D. Channell which were characterized as departures from normal character and personality about which the various witnesses testified, were summarized by the trial court in the findings of fact as follows:

"That he habitually slept out of doors, often in severe weather and would not sleep in a bed or inside a residence; slept under the trees, along fence-rows, in the city park, in or at the school house across the road from his 80 acres; that he wandered about from son to daughter and daughter to son from the home of his former wife and from neighbor to neighbor: that he claimed to have the 'keys to the kingdom'; that he controlled the rains and the weather, that he had power to separate the waters of the Cimarron river as Moses did the Red Sea for the Israelites; that gold was the representation of the devil, therefore he threw two 20-dollar gold pieces into the Salt Fork to escape its master; that he visited and communed with the devil at night, saying the devil was a pretty nice fellow if one got acquainted with him; that he met and talked with Jesus Christ and found himself to be one thousand years ahead of the Nazarene; that a red star guided him by night in his journeys; that he dreamed much and told his dreams, and explained that he had as much right to dream as did Joseph in prison; that he considered the Bible of less value than a Waterbury watch; that he, armed with a corn-knife and a gun, said he was only waiting to kill all the baldheaded men and redheaded women; that once he chained up his little daughter by a foot, that he tried to buy the flies from a grocer who had trapped them, in order that he could turn them loose

and save them from death; that when eating crackers and cheese for lunch, as he did frequently, he picked up the scattered crumbs and food from the dirty floor or the dusty ground and ate them; that he would buy such food and enter the restaurant kitchen to eat it where the flies could share it undisturbed; that he bought a fish from a boy in order to turn it loose again in the river; that he carried a pack of bedding from place to place and slept wherever occasion demanded; that he was careless in his dress, filthy in his habits, at times exposed his person; his hair and beard were long, matted, and unkempt habitually, and he hated the English, talked much upon religious questions and argued the Scriptures; said that the Ten Commandments were the only good it contained; and many other expressions along various lines. He seldom bathed and never shaved.

"Further, he participated little, if at all, in social or neighborhood activities; he did not attend church or Sunday School; he did not participate in public meetings; manifested no interest in public affairs or public questions; was offended with those who differed with him upon trifling matters, and exhibited little concern as to local, state, or national questions or affairs. He knew little and seemed to care less of his duties as a citizen as to his taxes; he said that God and the government gave him the land, and he did not have to pay any taxes on it."

Both lay and expert witnesses testified in behalf of the defendants to the effect that A. D. Channell was mentally competent to transact ordinary business, but a careful review of the voluminous record leaves no doubt that the finding of the trial court that he was entirely without understanding within the meaning of that term as defined by our statute and decisions is amply sustained by competent evidence.

We find no necessity for determining the validity of the order entered on January 12, 1927, by the county court of Logan county, purporting to restore A. D. Channell to capacity, since it is conceded by defendants that said order had no legal effect upon his mental status and that the trial court did not err in holding that the question of his sanity was an open one to be determined from all the evidence introduced at the trial of this cause.

Defendant Arch Channell contends that he is now vested with title by prescription by virtue of his possession of the property for a period of more than 15 years. It was pointed out in the case of Thomas v. Morgan, 113 Okla. 212, 240 P. 735, 43 A. L. R. 934, that since a prescription presumes a grant, and cannot exist where there is no power to grant, it follows that a prescriptive right cannot be acquired against a person who is under legal disability and unable in law to resist the alleged adverse claim if it is not well founded, and that the rule is applicable in the case of an insane person. See Annotation and Authorities 43 A. L. R. 950. Since A. D. Channell was under disability at the time Arch Channell gained possession of the property and continued under such disability until his death there is no merit in the claim of title by prescription.

The statute of limitations did not begin to run against the plaintiffs herein until the death of their ancestor, A. D. Channell, because they had no right to bring suit until his death. Parker v. Betts (Colo.) 107 P. 816; Ralph v. Ball (Kan.) 164 P. 1081; Jenkins v. Jenkins (Kan.) 146 P. 414. The period within which this action might be brought is fixed by the fourth subdivision of section 99, O. S. 1931, at 15 years. Campbell v. Dick, 71 Okla. 186, 176 P. 520. Since said period began to run at the date of the death of A. D. Channell, this cause is not barred by any statute of limitations.

We pass to a consideration of the validity of the tax deed. Plaintiffs contend that the deed shows upon its face a failure to comply with the statute relating to service of notice of demand for a deed. The following recital appears in said deed:

"* * * and the said legal owner of said certificate of purchase having served notice on the owner and occupant of said described tract of land that he would demand deed for same as provided by law. * * *"

Section 12759, O. S. 1931 (68 Okla. St. Ann. sec. 451), provides that the service of notice upon the owner of land of a demand for a tax deed shall be made in the same manner as that of summons in courts of record. Sections 166 and 171, O. S. 1931 (12 Okla. St. Ann. secs. 153, 158), provide that summons in courts of record shall be served by the sheriff or a responsible citizen of the county, not a party to or interested in the action, appointed by the officer to whom the summons is directed or by the court in which the action is brought. It is noted that the tax deed involved herein shows upon its face that the notice was served by the purchaser, who is not a party authorized by law to serve the same. Evidence was introduced to the effect that the notice was actually served by the sheriff, but

since the early case of Hanenkratt v. Hamil, 10 Okla. 219, 61 P. 1050, it has been the rule that:

"It is not competent for a tax-deed holder to introduce evidence to contradict the recitals of his tax deed."

The tax deed is therefore void upon its face and it is not necessary that the action to cancel the same be brought within one year from the date of recording. Lind v. Stubblefield, 138 Okla. 280, 282 P. 365.

Defendants contend that plaintiffs were required to tender the taxes, interest, penalties, and costs as a condition prerequisite to the cancellation of said deed by the trial court. Plaintiffs insist that, since the deed is void upon its face, no tender is necessary. In the recent case of Thompson v. Yates, 184 Okla. 85, 85 P.2d 415, it was held:

"Under section 12761, O. S. 1931 (68 Okla. St. Ann. sec. 453), a tender in open court of all taxes, penalties, interest and costs, which the party seeking to redeem would be bound to pay if he was then redeeming the land from tax sale, is made a condition precedent to the presentation of a defense to an action by a tax deed holder for the recovery of possession, although no affirmative relief is sought, where the land is liable for taxation, has been assessed and extended upon the tax rolls, in substantial compliance with the statutes, and the taxes have not been paid; and, under such circumstances, the tender is required whether the tax deed be valid, voidable or void.

"Where the tax deed holder sues to quiet title, and a copy of the tax deed is attached to the petition, and is void upon its face, and where the former owner fails to make the required tender, it is proper to dismiss both the petition and the defense without prejudice, since neither party

under such circumstances, is entitled to any relief."

See, also, Schulte v. Herndon, 184 Okla. 77, 84 P.2d 607. In these cases it is pointed out that the prior decisions of the court are in conflict, and inasmuch as the parties had relied upon certain decisions holding that a tender was not necessary, the trial court was authorized, upon a remand of the case, to allow a reasonable opportunity to comply with the tender statute.

In the instant case further proceedings in the trial court are necessary in nature of an accounting. By virtue of the precedent above referred to, we deem it proper to direct the trial court to allow plaintiffs a reasonable time to make a proper tender of taxes, interest, penalties, and costs, if they so desire. In the event of either compliance with the statute or failure to make a tender, the duty of the trial court is clearly outlined by the above-quoted authority.

Accordingly, the judgment of the trial court canceling the quitclaim deed above mentioned is affirmed, and the judgment of the trial court canceling the tax deed is affirmed on condition that plaintiffs make proper tender, within a reasonable time to be fixed by the trial court, of taxes, interest, penalties, and costs as above set forth, and in default of said tender the trial court is directed to enter judgment denying relief to plaintiffs or to defendants in so far as said tax deed is concerned, and that the court further proceed not inconsistent with the views hereinabove expressed.

BAYLESS, C. J. and RILEY, GIBSON, and DANNER, JJ., concur. HURST and DAVISON, JJ., concur in conclusion. CORN, J., dissents. WELCH, V. C. J., absent.