### BUSH et al. v. BUSH.

No. 19177. Opinion Filed March 18, 1930.

Mauntel & Spellman and Chase & King, for plaintiffs in error.

E. W. Snoddy, for defendant in error.

BENNETT, C. This was a civil action wherein F. B. Bush and E. M. Bush, as plaintiffs, sought to cancel a warranty deed executed by James M. Bush to defendant Charles R. Bush. The parties occupy here the same relative positions as in the trial court.

The petition alleged that plaintiffs and defendant were the only children and heirs at law of James M. Bush, deceased, who died about March 20, 1924, seized of west half of northeast quarter and west half of southeast quarter of section 31, township 29 north, range 14 W. I. M., in Woods county, Okla.; that said decedent, while sorely diseased, and weak in body and mind, executed the

warranty deed aforesaid conveying above-described lands to Charles R. Bush; that such conveyance was procured by the fraud and undue influence of grantee.

Defendant filed a general denial followed by an admission that decedent, upon a proper consideration, executed to defendant a valid general warranty deed to prem.ses described in petition.

The allegations of the petition were somewhat wider in scope than herein indicated, but in the initial stages of the trial it was made to appear to the court that the question of mental capacity of decedent would not be an issue, and that the case would be tried solely upon the issue as to whether or not there was a consideration for the conveyance attacked.

Many witnesses testified, but an abridgment of their evidence will suffice.

James M. Bush located near Alva, Okla., when the Cherokee Outlet was opened for settlement and acquired and lived upon the lands in controversy until shortly before his death in March, 1924. He was divorced from his wife, the mother of plaintiffs and defendant, many years ago, and lived practically alone since 1901. Charles Bush at the date of trial was 41 years old; Frank was 40 and Elmer was 34. The record discloses that from about 1896, until Charles was married, he lived with his father and helped him farm the homestead, and for 18 or 20 years before his father's death, he lived within a quarter mile of his father, and cultivated, or assisted in cultivating, said land, with the exception of one year. Frank Bush lived at various places; and Elmer, for the most part, made his home with his mother, but the two made occasional visits to their father's home. The father spent about a month with Frank Bush, who lived at Hardtner, Kan., in the fall of 1923, but later moved to the home of defendant, where he spent the remainder of his days. A house was purchased for the father's occupancy and attached to the residence of defendant.

About January 15, 1924, James M. Bush and defendant went to the office of T. J. Womack who had been practicing law in Woods county for many years. The elder Bush had known this attorney since 1896, and had had legal and other business with him. James M. Bush informed the lawyer that he wished him to draw up a deed conveying his home place to Charles Bush, and gave him detailed information as to the consideration, etc. A general warranty deed was drawn up in conformity to this request

and same was formally executed, acknowledged and delivered in the office of grantee. Said attorney was also requested to draw a contract between said parties, providing, among other things, that, in consideration of the execution of said deed, Charles should pay his father $500 within six months, and containing the following:

"It is further agreed by the said party of the first part to and with the second party, that he will and shall house, keep and board and give such care and attention as the second party may need, and such as is due from a son to a father in his declining years, and supply him with all the necessary needs during the remainder of his lifetime and such as his condition may require.

"It is further agreed by and between the parties hereto that said first party shall and will harvest, thresh and deliver at Hardtner, Kan., one-half (1-2) the wheat crop or the proceeds thereof, now planted and growing on the above-described land, to the second party at his option.

"It is further agreed by and between the parties hereto that the party of the first part shall and will harvest and thresh all of the wheat grown on the above-described land and deliver to the second party at Hardtner, Kan., free of charge, one-third (1-3) of all said wheat grown on said land each year thereafter during the remainder of the life of the said second party."

The attorney informed Mr. Bush that he would investigate the law, and would then draw the contract and mail same out to them. The attorney looked up the matter and drafted contract as indicated and mailed same within a week to the parties. This contract conformed to both oral and written instructions given said attorney. James M. Bush informed the attorney just what the agreement was between them.

There is evidence that defendant was to pay the $500 out of proceeds of a loan to be negotiated on the land. The contract mailed out was not signed. The only explanation of this omission was made by Charles Bush to the effect that they were expecting to go back to Hardtner, and sign and acknowledge same before a notary public, but that they put the matter off and did not attend to it. It also appears that Charles proceeded to do the things called for in the contract; that he maintained his father as a member of his household; that the only reason he did not pay the $500 was that the loan had not been concluded and proceeds received before the father's death, but that an application had been promptly made and the loan was in process of negotiation. The loan was finally ap-

proved and proceeds paid late in April, 1924, a short while after the death of James M. Bush.

It is in evidence that said James M. Bush was up and about, able to saddle and ride his horse, make sales of his personal property and see to removal of same over to the home of Charles R. Bush. The personal property was retained by said James M. Bush.

It is shown, too, that the deed was immediately placed upon record and Charles testified that he knew what the terms of the contract were when the deed was delivered to and recorded by him; that almost immediately after putting the deed on record, he made application for a loan on premises according to agreement with his father; that this was done to expedite securing of money to make payment under the agreement.

The $500 was never paid, but Charles paid the funeral expenses and doctor bill of his father, but same was a voluntary payment on his part.

Defendant testified that he did not know and had no information that his father would live only a few months; that he was sick in November, 1923, but that he had seen him just as sick once or twice before; that James M. Bush named a consideration of $4,000 in the deed, having in mind that such consideration ought to be shown since the land was to be used to secure a loan; that a physician told defendant he thought that his father had cancer of the stomach, but that he might rally, and that he had seen him just as sick as he was then; that after the November, 1923, sickness, the father was able to be up and about, was able to saddle his horse and went on visits to neighbors and to various places, including roundups.

James M. Bush informed his neighbors that he was going to move a small house over into Charlie's yard so that he could have a house all to himself, and so he could do to suit himself and have his own way. One witness testified that he rode in a wagon with decedent to the old home place on Monday before he died on Friday to purchase a cream separator from Mr. Bush, who told him that he had sold the place to Charlie. At this point it was offered to show the physical condition of James M. Bush, but it was objected to as not being within the issues and the objection was sustained. Decedent spoke to a number of his neighbors with reference to his attitude towards

his sons and that he showed no preferences as between them. One witness had lived as a neighbor to decedent for 25 years, and had never heard any complaint by decedent of Charlie's treatment of him, except the one statement that they did not come into his room for two or three days.

The evidence also showed that decedent, some months before this conveyance, made application for a loan on the farm for the purpose of building a home in Hardtner, Kan., but that that loan did not go through; that later Charlie made an application for a loan of $1,500, and represented that he had bought the land from his father. This was before the father's death, but the loan was not completed during the lifetime of the father. The second application was about two months before James M. Bush died. James M. and Charlie were present at the time the two applications were made.

Evidence was introduced to the effect that all the needs of decedent were supplied by defendant and his family; that they gave him every proper care; that there were 75 acres of wheat growing on the premises at the time of the deed. A neighbor testified that decedent requested him to be on the lookout to buy a house to be moved over to Charlie's home in order that he might have a home for the balance of his life, and that he intended to leave his property to Charlie in such manner that Frank could not law him out of it. He said Frank had not treated him very well and had used improper language to him at times; that the decedent was conscious up to the time of his death and that he was asked if he desired that Frank be called and he indicated that he did not since Frank did not seem to care for him. There were a number of witnesses who testified that the father had told them he had sold his land to Charles, and indicated that he would live with him the balance of his life.

Another witness indicated that on account of the way in which he had been treated by Frank and Elmer, their father said that he would see that Charlie got the most of the property.

From this evidence, the following facts may be taken as conclusively shown in the light of the solemn admissions of counsel as to the vital issues to be determined: (1) James M. Bush, who had lived alone for 25 years on the farm of 160 acres of sufficient value to secure a loan of $1,500, made a general warranty deed to one of his sons who had lived within a quarter of a mile of him for all these years in consideration of $500

to be paid within six months, one-half of the growing crop and one-third of the wheat crop for each year thereafter, and the maintenance and support of the grantor during his lifetime. (2) This conveyance drawn by grantor's lawyer to whom the details of the transaction were made known fully; the deed, properly acknowledged, was promptly delivered and placed of record and the grantee immediately began and continued to comply with the terms of the purchase by making application for the loan out of which the $500 was to be paid and by the continuous support and maintenance of the grantor. (3) The grantor was apparently of intelligence and in full possession of his faculties. (4) All allegations of fraud, incompetency, and undue influence are either stricken from the pleading or treated as not within the issues in the cause, and there is no evidence supporting any such abandoned issues. (5) Numerous admissions were made by the grantor indicating a sale of the land to grantee and indicating the purpose and intent thereof.

We are referred, by the brief of plaintiffs in error, to the cases of Parker v. Parker, 75 Okla. 234, 182 Pac. 697; Weitz v. Moulden. 109 Okla. 119, 234 Pac. 583; Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756, and Rector v. Roy, 91 Okla. 14, 215 Pac. 415.

These cases simply announce the oft-repeated rule that:

"When confidential relations existing between two persons result in one having an influence over the other and a business transaction takes place between them, resulting in a conveyance to a person, holding the influence over him, the law presumes everything against the transaction and leaves the burden of proof upon the person benefited to show that the confidential re'ation has been, as to that transaction suspended, and that it was as fairly conducted as between strangers."

They are cases dealing with a situation where a confidential relation exists and accompanied generally with pronounced mental incapacity. Plaintiff puts great stress upon the argument in his brief that the relation of the parties (parent and child) was, in itself, sufficient to raise a presumption of fraud and undue influence, and upon that account insists that the burden was upon the defendant in this case. The rule is c'early announced in Jones' Commentaries on Evidence (2d Ed.) vol. 1, sec. 349, as follows:

"Where the situation discussed in the preceding section is reversed, and the conveyance is from parent to chi'd, it is at once apparent that the reason of the rule which has lead to declaration of a presumption in some instances, as above stated, does not apply with equal force. Accordingly, the recent cases hold generally that no presumption of undue influence arises from the mere relation of parent and child because of a conveyance inter vivos from the former to the latter, and that the burden of showing undue influence rests on the person attempting to inva.idate the conveyance."

This is followed by a wealth of supporting citations from many jurisdictions.

In the note to the case of Burton v. Burton, 17 A. & E. Ann. Cas. 984, at page 989, this principle is denominated as universal, Perhaps the doctrine is no more clearly stated or more strongly supported by sound reasoning than in Mackall v. Mackall, 135 U. S. 167, 10 S. Ct. 705, 34 L. Ed. 84; Towson v. Moore, 173 U. S. 17, 19 S. Ct. 332, 43 L. Ed. 597; Sawyer v. White, 122 Fed. 223, 58 C. C. A. 587; Meyer v. Jacobs, 123 Fed. 900.

The doctrine is recognized in Oklahoma:

"Whi'e the relation of a parent and child exists between the parties, this, within itself, is not sufficient to raise a presumption of fraud and undue influence. * * *" Weitz v. Moulden, supra.

Of course, an entirely different rule obtains where a fiduciary or confidential relation exists between the parent and child, or where a conveyance is made by a parent who is mentally incapacitated. In the case at bar there is an absolute absence of proof that the grantor was mentally unsound or deficient, or that there was any relation of trust, confidence, or dominance between the parties. There is not even any proof as to the physical condition of the grantor from which incapacity might properly be deduced or inferred, or from which it might be reasoned that he was unusually susceptible to influence from his son, nor is there any attempt to show in the evidence that the son asserted or assumed to assert any such dominance, coercion, or control over his father in this or any other transaction. Of course, in this connection it would not be logical to assume that the son, who had performed those acts of kindness, courtesy and consideration dictated by filial duty, did not have more influence over his father than those children who had become or had been more distant or disinclined, but such influence is not to be denominated undue influence. We see it every day. Examples are all too numerous of parents who are left stranded, or to the kindly offices of perhaps a single child, whi'e others seek their fortunes afar off. That a parent so circumstanced should look to the future and prepare himself against

156

his last days by a natural disposition of his property in favor of those who have always been mindful of him, is, we think, both natural and commendable. The average citizen has not reached the point where he is ready to entrust his last days to the munificence and benefactions of a prodigal son.

Plaintiff also insists that no sufficient consideration is shown for the support of the deed sought to be canceled in this action. Our court has recognized in the Weitz Case, supra, the sufficiency of the promise of support in the following language:

"The promise of support of the grantor by the grantee may, in a proper case, furnish a sufficient consideration for a deed. * * *"

In the case of Herwick v. Starkweather, 8 N. Y. S. 145, plaintiff sought to reform a deed, or, if that could not be done, to cancel it. The deed named a consideration of $500, but no consideration was, in fact paid. The court held that, in the absence of fraud or mutual mistake, a deed executed by a person with full knowledge of its contents and in consideration of a verbal agreement that he should be supported by the grantee, would not be reformed; and, on the question of cancellation, the court held that, since maintenance was to be furnished subsequent to the execution of the deed, and the deed was delivered without any condition attached, and that since the oral argument did not indicate that its full observance was made a condition precedent to the taking effect of the conveyance, and where the grantee thereunder began the performance of his part of the contract by furnishing the support, even if he should fail to substantially comply with his agreement to maintain, the same would not annul the conveyance; but that the promise to maintain and the beginning of the observance of such promise was a sufficient consideration.

The same doctrine is announced in Jacob Mayer v. Lavina Swift, 73 Tex. 367. In Anderson v. Gaines, 156 Mo. 664, a deed was sought to be set aside for want of consideration. The court in the opinion says:

"The promise of even an insolvent man to render a valuable service is a sufficient consideration to support a deed, and if the deed is given in consideration of the promise, the estate conveyed vests in the grantee, the title is not so held in abeyance until the performance of the promise, nor divested for a nonperformance."

The court cites and relies upon Studdard v. Wells, 120 Mo. 25; Taylor v. Crockett, 123 Mo. 300; Brown v. Fickle, 135 Mo. 405.

The court in the Anderson Case, supra, says:

"There is no charge in this petition of fraud or unfair advantage taken by defendant; and there is no clause in the deed looking to a forfeiture, a re-entry or reverter. There is nothing in the petition upon which a decree for the cancellation of the deed can be founded."

Under these doctrines, we must hold that the consideration for the deed was sufficient.

It is next urged by the plaintiff for reversal that the court committed error in permitting Charles R. Bush to testify as to conversations in his presence between decedent and T. J. Womack, the attorney who acted for both parties in drawing up the deed here sought to be canceled. The attorney for defendant concedes this to be error, and we shall not examine the same further than to say that this should not reverse the case for plaintiffs had not met the burden of proof resting upon them; and, moreover, the record discloses that T. J. Womack testified at length and in great detail to the identical matters testified to by Charles and many more as to the conversations of decedent about the sale and his directions as to the preparation of the papers, etc. And the court, at the instance of plaintiffs, and over the exceptions of defendant, struck out this testimony of Womack, but admitted testimony on the identical questions by Charles R. Bush.

An opposite ruling should have been made all around. Charles R. was not a competent witness, but Womack was:

"Where an attorney is employed by both parties to a transaction, an exception to the general rule has been recognized, it being said in such a case that the communications so made are not privileged." Kaufman v. U. S., 212 Fed. 613, 129 C. C. A. 149. Modern Law of Evidence, Chamberlayne, vol. 5, par. 3693, p. 5281; Harris v. Harris, 136 Cal. 379, 69 Pac. 23; Sparks v. Sparks, 51 Kan. 195, 32 Pac. 892.

"In contests among personal representatives or heirs of persons who consult a common attorney, any party may require the attorney to testify concerning matters communicated to him by any of his clients." 10 Encyclopedia of Evidence, p. 297.

"When two or more persons consu't an attorney as the common and joint advisor, communications between them and such attorney are not privileged in actions among themselves, and any one of them may require the attorney to testify as to such communications." 10 Encyclopedia of Evidence, p. 294.

To the same effect is Hanlon v. Doherty, 109 Ind. 37, 9 N. E. 782; Security L. & T. Co. v. Estudillo, 134 Cal. 166, 66 Pac. 257;

Wigmore on Evidence, vol. 4, sec. 2312, and cases cited.

It would seem idle to remand this case under this record, when it clearly appears plaintiffs have failed to sustain their burden and make out the case, only to have further evidence, including the written contracts introduced, to further preclude plaintiffs, and where all such evidence is a part of this record. Muskogee Refining Co. v. Waters Pierce Oil Co., 89 Okla. 279, 215 Pac. 766; Naill v. Order of United Commercial Travelers, 103 Okla. 179, 229 Pac. 833.

It is needless to prolong this opinion by discussing the other valuable considerations which moved the grantor to execute the deed in question. It is sufficient to say that the defendant appears to have been making an honest effort to comply with this obligation in this behalf.

Finding no evidence of fraud and no disability on the part of the grantor, and that the consideration for the deed is good and sufficient to support the same, and no reversible error appearing in the record, the judgment of the trial court is affirmed.

DIFFENDAFFER, HERR, HALL, and EAGLETON, Commissioners, concur.

By the Court: It is so ordered.