Frances Lem Pipkin HIGGINS and James W.
Pipkin, Plaintiffs in Error,

v.

Marshall W. PIPKIN and Mildred Pipkin,
Defendants in Error.

No. 38911.

Supreme Court of Oklahoma.

March 7, 1961.

See also 348 P.2d 330.

Dick Bell, Seminole, Bill Biggers, Wewoka, for plaintiffs in error.

J. T. Criswell, Prague, Raymond Criswell, Wewoka, for defendants in error.

HALLEY, Justice.

Mrs. B. V. Pipkin was the mother of the plaintiffs in error, Frances Lem Pipkin Higgins and James W. Pipkin, and also of Marshall W. Pipkin, one of the defendants in error. She had two other daughters and four grandchildren who were not parties to this action.

This action arose because on July 11, 1955, Mrs. B. V. Pipkin executed a warranty deed to her son, Marshall W. Pipkin, conveying about 520 acres of land which she owned in Seminole County, Oklahoma. The deed recited a consideration of $3,500.

At the time of the execution of the above deed, the grantor, Mrs. B. V. Pipkin, was in the hospital at Seminole, Oklahoma, partially paralyzed from a stroke suffered on or about June 20, 1955 at Sterling, Colorado, where she was visiting one of her daughters. She was hospitalized and placed under the care of a doctor. July 6, 1955, she was transferred by plane to Seminole. She spent some of her time in the hospital until she died October 8, 1957.

On January 27, 1958, two of her children, plaintiffs in error, filed an action in the District Court of Seminole County, seeking, among other things to cancel the above warranty deed which she executed to her son, Marshall W. Pipkin, on July 11, 1955, conveying the aforementioned 520 acres of land. It was alleged that Mrs. Pipkin was mentally weak and incompetent and so lacking in understanding as to be unable to realize the nature and effect of her acts, and was induced to execute the deed by fraud and undue influence of her son, Marshall W. Pipkin, and also that the deed was executed without any valuable or monetary consideration.

October 24, 1958, a trial was had before the court and on November 7, 1958, the court rendered judgment in favor of defendants in error, except that defendants in error were ordered to pay to the other heirs at law of Mrs. B. V. Pipkin, deceased, the sum of $1,000. Motion for a new trial was overruled and plaintiffs below have appealed.

Only one assignment of error is presented by the plaintiffs in error, which is that the judgment rendered November 7, 1958, is contrary to law and is not sustained by sufficient evidence. We shall refer to the parties as plaintiffs and defendants as they appeared in the court below.

Plaintiffs call our attention to Section 23, 15 O.S.1951, which provides as follows:

"A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission without prejudice to the rights of third persons, as provided in the article on extinction of contracts."

It is then asserted that the above statute is clearly construed in Marten v. Wagner, 198 Okl. 273, 178 P.2d 618. With this we do not agree for in the case at bar as will be shown hereafter, there was an abundance of evidence to the effect that Mrs. Pipkin' possessed sufficient mental capacity to transfer her land.

This is an equitable action and the rule is well established that in such actions this Court will examine the entire record and weigh the evidence, but will not reverse the findings and judgment of the trial court unless it is clearly against the weight of the evidence.

The above rule is announced in Wahby v. Renegar et al., 199 Okl. 191, 185 P.2d 184, 185, wherein it is said:

" * * * The rule is settled that, in actions of equitable cognizance, this court will examine the record

and weigh the evidence, but will not reverse the findings and judgment of the trial court unless clearly against the weight thereof. Also settled is the rule that in actions of equitable cognizance the trial court's findings and judgment based upon conflicting evidence will not be disturbed on appeal because of the conflict in the testimony, or because it is possible to draw another conclusion from the testimony. Johnston v. American Finance Corporation, 182 Okl. 567, 79 P.2d 242; Johnson v. Rowe, 185 Okl. 60, 89 P.2d 955; Harrell v. Nash, 192 Okl. 95, 133 P.2d 748."

Plaintiffs admit there is some conflict in the evidence before us. Frances Higgins testified in part as follows:

"Q. Was she able to comprehend and understand matters fully at that time? A. Part of the time, but not all of the time.

"Q. Do you know whether or not there were any instances happened in the hospital at Sterling, Colorado such as her falling out of bed or anything of that nature? A. Yes.

"Q. Well, you just tell the Court the instance and what happened? A. There was one night that she was delirious I would say, and felt that she could walk. She tried to get out of bed and fell. I found this out from the nurses and doctor when I went over the next morning, they were furious with her.

"Mr. Criswell: We object to this line of testimony.

"Court: Well, sustained. You can't tell what somebody told you, but you can tell what you found out.

"A. There was another high fever and the children's ward was just down the hall and she heard this particular baby crying and she wanted the nurse to bring the baby in and be placed in bed with her. And then there was another time she thought she heard Wade's voice down the hall, and Wade had returned to Denver the day before and I assured her that Wade was not there."

Wilma Hayes testified as to the mental capacity of Mrs. Pipkin to execute the deed in question as did Dr. C. J. M., who treated her in Colorado when she first became ill. Dr. W. E. J. also gave his expert opinion and these witnesses agreed with Mrs. Higgins that Mrs. B. V. Pipkin did not have sufficient mental capacity to understand the nature and effect of a transaction affecting her farm which she deeded to her son, Marshall W. Pipkin.

For the defendants there were several witnesses who testified that Mrs. Pipkin had the mental capacity to understand what she was doing when she executed the deed to her youngest son.

We think the most qualified witness was Dr. P. D. M. of the hospital at Seminole. He was her doctor from the time she returned to Seminole until her death and he testified that she had had a stroke which paralyzed her left side and required a small amount of sedatives, but for only a short time. He testified in part as follows:

"Q. In your opinion Doctor on July 11, 1955, there was a deed executed by Mrs. B. V. Pipkin to her son Marshall of some land in the Northern part of this county. On that date, if you know, could you state whether or not Mrs. Pipkin was in possession of her mental faculties enough as to realize and understand the results of her transactions? A. I think she was, sir.

"Q. Was there any time from the time she was admitted to the hospital in July, 1955, until the time of her death when she was not in possession of her mental faculties? A. I would say perhaps during the last few months there would be times. I don't recall any, except maybe the date she died.

"Q. Did you ever see Mrs. Pipkin read a newspaper? A. Well she

read the newspaper while she was there in the hospital."

Dr. P. D. M. also testified:

"Q. Doctor M——— from July 6th of 55 through August 21st of 55, was there any period of time in there that Mrs. Pipkin would be rightful and other periods of time not rightful? A. I think she was rightful all the time.

"Q. Do you think she was rightful all the time? A. Yes, sir."

It appears that prior to her last illness, on June 14, 1955, she left a note in her home addressed to her son, Marshall Pipkin, and after she became ill in Colorado and returned to Seminole, she told him where to find this note. He found the note and it is as follows:

"Tuesday June 14—55.

"Marshall in this envelop I am leaving keys to the bldg. & the key to safety deposit box in First National ·Bank—in case anything happens to me I want you to handle things like we have been doing I grant you power of attorney to handle everything for me—I also want you to have the farm because you have sweated your life blood out there.

"Love
"Mother.
"B. V. Pipkin."

Dr. M. also testified as follows:

"Q. Did you determine from your examination where this occurred with reference to the brain? A. Yes, sir.

"Q. What portion of the brain was affected? A. What portion of the brain?

"Q. Yes. A. There was the motor area of the brain on the right side and it effected the left.

"Q. Now what effect would a stroke or cerebral hemorrhage of the motor portion of the brain have on a person? A. You mean in her case?

"Q. Yes, sir. A. It produces paralysis of the left side of the body.

"Q. Would a stroke of this hemorrhage of the motor portion of the brain in any way effect her mental faculties? A. No, sir."

*    *    *    *    *    *

"Q. Would you consider Mrs. Pipkin an intelligent person before the time she had the stroke? A. Yes, I think she was the best one of the Pipkin family. She was all right.

"Q. Did you notice any material change in her mental faculties after the stroke? A. No, sir. She was all right.

*    *    *    *    *    *

"Q. Doctor M———, does your daily treatment reflect whether or not you gave her any sedatives? A. No, she had on the—she had one quarter grain barbital the night she came in. And on the 6th, P.M., late, bed time I gave her a quarter grain *pentobartital*, not much, and then on the night of July 8th, she had one, and she had one on the night of July 11th, outside of that she had nothing, she didn't require anything."

Floyd Aylor, assistant county clerk, who took the acknowledgment of Mrs. Pipkin to the deed here in controversy on July 11, 1955, about the noon hour on that date, testified that she said she had a lot of expense and that what she was doing was the best way to get the money to meet her financial obligations; that they talked about the deed; that her son, the grantee, Marshall Pipkin, said nothing to urge her to execute the deed; that she talked as reasonable and sensible as any one he ever talked to; that Mrs. Pipkin always recognized him and his wife when they visited her on afternoons.

Herman Bishop testified that he had business transactions with Mrs. Pipkin both prior and subsequent to her illness and the execution of the deed, and could tell no material difference in her mental capacity before she suffered the stroke and after and that she was a shrewd business woman.

Lola Rhae testified she had known Mrs. Pipkin since 1910 and was closely associated with her in 1950 through 1955; that Mrs. Pipkin was perfectly alright mentally, although crushed physically and embarrassed by her condition, yet her intelligence was not affected.

Gerva Anderson, a daughter of Mrs. Pipkin testified that the mental condition of Mrs. Pipkin was unusually good when she arrived at the hospital on July 6, 1955, and after that time her mental condition was as good as it was prior to the stroke. It is true that the testimony offered by defendants was contradicted by that of Dr. C. J. M., who treated Mrs. Pipkin in Colorado and that of Dr. W. E. J. of Seminole and Wilma Hayes. We note that Dr. J. never did actually treat Mrs. Pipkin, but based his opinion mostly upon case history. We cannot say that the findings and judgment of the trial court as to mental capacity, fraud and undue influence is clearly against the weight of the evidence.

Plaintiffs contend that the deed of July 11, 1955, should be declared void because the deed was intended as a gift to Marshall W. Pipkin by the grantor. It is quite clear that the mother intended to give her son the farm on which he had worked very hard. This is shown by her oral words and the note or letter she wrote to him before she became ill. She did expect him to take care of her obligations. He admitted that he had only paid $2,500 in paying her debts but that the consideration of $3,500 did not affect the validity of the deed and had no bearing upon its consideration.

The trial court must have believed that the grantee was obligated to pay the entire $3,500, which accounts for the requirement in the decree of November 7, 1958, that defendant pay the additional $1,000 for the benefit of the estate of his deceased mother. Defendant cites the case of Bush v. Bush, 142 Okl. 152, 286 P. 322, 326, where the facts were that a father deeded land and other property to his son, reciting a consideration of $4,000. The son was to give the father $500 and the father was to make his home on the land and receive rent as long as he lived. The son never paid the $500, but did furnish his father board. Another son of the grantor sought to cancel the deed on the ground of fraud and failure of consideration. In that case the court specifically stated that "there is an absolute absence of proof * * * that there was any relation of trust, confidence, or dominance between the parties.", and in sustaining the deed held:

"Where a deed, executed by a father to his son apparently upon a good and valuable consideration, is sought to be canceled on the ground of fraud, undue influence, and failure of consideration, the fact that the relation of · parent and child exists between the parties is not, within itself, sufficient to raise a presumption of fraud, undue influence, or absence of consideration so as to cast the burden upon the grantee to show that the transaction between them was in good faith."

▬ There was no evidence here that the defendant exercised undue influence over his mother or that a confidential relationship existed between them. We consider that Antle v. Hartman et al., 193 Okl. 524, 145 P.2d 756 and Wills v. Dissing, Okl., 356 P.2d 339, are controlling in this case. See also Schatz v. Wintersteen, 201 Okl. 660, 208 P.2d 1136. Under the foregoing decisions and many others, the burden of proof as to lack of mental capacity to make a deed was upon the plaintiffs.

▬ As to consideration for the execution of the deed, defendants do not contend that any consideration was agreed to by grantee to grantor, but say that the conveyance was in the nature of a gift from the mother to the son. In Shaw v. Shaw, Okl., 282 P.2d 748, 752, there was no consideration in the deed from father

to son and an effort was made to establish a trust. The court said in part:

"Plaintiffs assert that the evidence does not sustain a gift to the defendant; that no consideration was plead or proven. Love and affection are certainly a valid consideration, and the deed itself recites a consideration. For that matter, the evidence is clear that the defendant accepted the gift if it were one and the finding of the court, which inheres in the judgment, that if it were a gift that all elements of a valid gift inter vivos were present is not clearly against the weight of the evidence."

$3,500 was cited as a consideration for the deed. Certainly this, love and affection and a plain gift were enough to sustain the deed in question.

We find sufficient evidence to justify the judgment of the trial court and the judgment is affirmed.