## Moore et al. v. Bugg's Ex'r et al.

(Decided June 10, 1938.)

136

[black redacted area]

M. C. ANDERSON and R. O. WILLINGHAM for appellants.

ROY M. SHELBOURNE for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

W. J. Bugg and Mary S. Bugg, husband and wife, were residents of Carlisle county, Ky., and the owners of certain real estate and some personal property.

On February 1, 1933, the said W. J. Bugg and Mary S. Bugg executed their deed of conveyance to appellants to one of their farms in Carlisle county, comprised of about 72 acres, for the consideration that appellants provide for them, grantors, support, care and attention in their old age or when they became incapacitated to keep house or to care for themselves. The pertinent part of the deed reads as follows:

"Witnesseth, that, whereas, the said W. J. Bugg and Mary S. Bugg, his wife, are advanced in years and as they grow older it may develop that they and each of them will become incapacitated and unable to keep house, and now, therefore, the said W. J. Bugg and his wife, Mary S. Bugg, in order to provide for their support, care and attention in the event they or either of them should reach that period in life when they can not care for themselves and under the promise and agreement of the parties of the second part, which is made the consideration for this deed, that in the event either W. J. Bugg or Mary S. Bugg should become incapacitated and unable to keep house then in that event parties of the second part agree, bind and obligate themselves to furnish to parties of the second part or either of them a room in their dwelling house located on the lands hereinafter de-

scribed, which room shall be furnished by parties of the first part, and in addition to furnishing said room parties of the second part further agree, bind and obligate themselves jointly and severally to furnish parties of the first part all necessary food and cook and prepare the same for use and to render to parties of the first part such personal care and attention at all times as their needs may demand in the way of nursing or otherwise, and in the event it should turn out that the personal care and attention required by the parties of the first part are so great that parties of the second part can not of themselves render said services then in that event parties of the first part out of their own funds will pay for such extra help or nursing as may be necessary. But it is understood and agreed, however, that parties of the first part will provide out of their own funds the necessary means to purchase clothing, pay medical bills and burial expenses have, and by these presents do hereby sell, grant, bargain, alien and convey to the parties of the second part their heirs and assigns forever the following described property:" (We omit description)

At the time the deed was executed W. J. Bugg was 81 years of age and Mrs. Bugg was approximately the same age. After the execution of the deed Mr. and Mrs. Bugg remained at their home in Arlington and appellants, who were and had been for many years past the tenants of Mr. Bugg and residing on the land conveyed to them, remained in the possession of the land.

In February, 1934, Mrs. Bugg died and Mr. Bugg went to the home of appellants who were residing on the land he had deeded to them and lived with them until about June 5, 1935, when he left and went to his home in Arlington and lived with his tenant or tenants in that home until his death in the summer of 1936 (which was after the rendition of the judgment herein but by proper orders the action was revived in this court in the name of Mr. Bugg's executor).

In October, 1935, about four months after Mr. Bugg left the home of appellants, he brought this suit in equity in the Carlisle circuit court to cancel and set aside the deed on the ground that appellants failed to perform the contract, alleging that they had breached

the contract, in that they mistreated him and failed to provide for his comfort and support, etc. He prayed in the alternative, asking that the deed be cancelled and set aside, or that he recover of appellants the sum of $1,500 for breach of contract.

Appellant entered motion that the court require Mr. Bugg to elect which cause of action he desired to prosecute—his action to set aside the deed, or to recover on breach of contract—which motion was overruled with exceptions. But since the ruling of the court on that question is not questioned in brief of appellant or insisted on we need not determine that question.

Appellants filed their answer, set-off and counterclaim, in which they denied the affirmative allegations of the petition, and affirmatively alleged, among other things, that they had made permanent improvements of the buildings on the land to the amount of $1,000 and that the value of the land was enhanced in that sum; and further, that the plaintiff without cause or fault of defendants abandoned their home and has since said time refused to make his home with them so as to permit them to carry out the terms of their said contract, which they had at all times stood ready, able and willing to carry out and would perform and discharge the same but for the acts of plaintiff in refusing to permit them to do so, and prayed that plaintiff's petition be dismissed, but in the event they are not entitled to that relief, that they have judgment against the plaintiff in the sum of $2,000 on their counter-claim and be adjudged a lien against the land to secure the payment of the judgment.

After the execution of the deed and before this action was filed appellants mortgaged the land to the Federal Land Bank to secure a loan of $500, about one-half of which sum they expended in repairing the house on the farm and perhaps other improvements, and applied the remainder of that sum to the payment of their personal obligations. W. J. Bugg left a will making certain devises to the Widows and Childrens Home of the Masonic Lodge of Kentucky, his niece, Hettie Brock and the Arlington Baptist Church. The Federal Land Bank and the devisees and certain heirs-at-law of Mr. Bugg were made party defendants to the action, but none of them are parties to this appeal.

Upon the issues made by the pleadings as we have

indicated, the evidence was taken and the chancellor entered judgment cancelling and setting aside the deed with the proviso that the appellants remain in possession of the land until January 1, 1937, which gave them three years use of the farm since the execution of the deed. The court further adjudged that the Federal Land Bank has a first lien on the land to secure its note in the sum of $500 executed by appellants and secured by the mortgage on the land; and further adjudged that W. J. Bugg assume and pay the said mortgage lien indebtedness of the Federal Land Bank and awarded appellants a lien against the land to indemnify them against any loss or damage they may sustain by the failure of W. J. Bugg to pay said indebtedness to the Federal Land Bank; and further adjudged that appellants' counter-claim and set-off be dismissed and that they pay the cost of the action. To reverse that judgment appellants have prosecuted this appeal.

It is insisted by appellants that the evidence was insufficient to warrant a cancellation of the deed, in that it discloses that W. J. Bugg, the grantor, left the home of appellants without fault on their part and put it out of their power to perform the contract, and cites Bowles' Adm'r v. Harvey, 189 Ky. 598, 225 S. W. 367; Elswick v. Elswick, 220 Ky. 723, 295 S. W. 1070. And they further invoke the rule that the power reposed in courts of equity to set aside deed solemnly entered into between the parties is an extraordinary one and should not be lightly exercised. Citing Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. (2d) 4; Lacey v. Layne, 190 Ky. 667, 228 S. W. 1; Beattie v. Friddle, 229 Ky. 361, 17 S. W. (2d) 246; Sutton v. Cornwell, 267 Ky. 346, 102 S. W. (2d) 25.

The question here to be determined is whether or not the facts of this case bring it within the category of the cases supra and to determine that question a review of the evidence becomes necessary.

Mr. Bugg testified that about the first of March, 1934, or soon after his wife died, he went to the home of appellants to live with them and remained there until about June the 4th or 5th, 1935. He was asked to tell how he was treated while there with respect to being provided for and why he left, and the substance of his story is that for about the first two months he was there they treated him very nicely; that they had plen-

ty to eat and furnished him with suitable food for about two months and then they began to neglect him in the way of preparing suitable food for him. He testified in part as follows:

"I hadn't been there long until the butter tasted of onions; I couldn't eat it; I said, 'I can't eat butter with onions—a person can learn to eat it, I guess I could.' Right on top of this Minnie says, 'Uncle Billie, I have no oats this morning,' I said, 'that is alright. There is plenty to eat here for anybody, I am not that mean.' They knew I couldn't eat meat, nor anything hard, but he says 'you can eat meat,' I says 'there is plenty to eat for anybody'; that liked to have killed Bigg Bugg, thinking I had trusted my life with what I thought would take care of me. I didn't have the blunt to stand this—I went in my room and cried. Minnie and Herrin came in there, and Minnie says, 'what is the matter?' I said 'nothing much.' Herrin raved out at me and said, 'what is the matter?' As soon as I could talk, I said, 'Herrin, I could have gone to a hotel and boarded, but it suited me to come out here, to have my dog and my gun and pass the child of my days. You don't want me to have a dog and eat onion butter'."

He further testified that he bought eggs, butter and milk and perhaps other groceries in order that he might have suitable food to eat. He said that he had a horse, and appellant, Herrin Moore, did not like for his horse to run in the yard and told him to turn him in the pasture; on the next morning the horse was in the yard and Herrin came out and said, " 'You expect me to do all this work for nothing, you are not the man I took you to be.' I didn't know what he meant." It appears that the above statement by appellant, "You are not the man I took you to be," wounded Mr. Bugg's feelings and he made reference to that statement occasionally throughout his testimony. After detailing many unpleasant experiences and what he termed ill treatment at the hands of appellants, he said that he had made up his mind to stay until he died "if Minnie (Mrs. Moore) hadn't taken a bad spell." The "bad spell" referred to by him was that when he went into the kitchen to prepare some bread for his dog, Mrs. Moore said to him: "* * * if you don't get

out of here, I will knock your head off." He further said:

"I went in my room and in a few minutes the boys come and said, 'dinner.' I said, 'I cannot eat.' Minnie come and said, 'dinner'; I didn't eat, I went to Arlington and got my supper, come back and went to bed, and Herrin come in and said, 'supper.' Come breakfast, I said, 'I cannot eat.' He said, 'forget it.' I was fixing to leave that morning and Herrin come in my room, and I said, 'Herrin, I always thought a lot of you but I cannot stay no longer; I am going to leave'; what did he say? 'You will be awful sorry of it;' I haven't been sorry, my board has cost me $20.00 per month ever since. If he couldn't understand my leaving I should have wrote him. I left and he will tell you how sweet he was to invite me to come back and he told half of Arlington, 'his room is ready when he comes back.' He told me that the morning I left."

He was asked to tell the judge why he left the home of appellants and he answered: "Why would you leave if you were threatened to have your head knocked off." It appears from the above answer quoted and the previous statement that he had made up his mind to stay, until Mrs. Moore threatened to knock his head off, that that incident was the sole reason for his leaving the home of appellants. The evidence of Mr. Bugg indicated above is the only evidence offered for him having any material bearing on the issue.

The appellants, testifying in their behalf, denied all the material evidence of Mr. Bugg as to any mistreatment of him, or that they neglected to furnish him with proper or suitable food, except that Mrs. Moore did not deny the threat "to knock his head off" on the occasion when he came into the kitchen to prepare food for his dog. When asked if she made that statement, she said: "I think I did, but he had annoyed me so much while I was trying to do my work."

It appears from the evidence of the appellants that after they learned that Mr. Bugg's feelings were wounded because of that statement they tried to get him in a good humor and asked him to stay at their home and after he left Mr. Moore went to Arlington and tried

to persuade him to go back to their home and live with them. Mrs. Moore admitted that Mr. Bugg bought eggs but said that she told him that they had eggs and it was not necessary for him to buy eggs and he said that the people from whom he purchased the eggs owed him and he was going to get out of them all he could. Mr. Bugg stated in his testimony that the people from whom he purchased eggs owed him rents. Appellants testified that they were ready, able and willing to carry out their contract with Mr. Bugg and had tried to persuade him to live with them. They said Mr. Bugg was very childish, high-tempered and ill, and was "like dynamite—just blow up at any little incident," and on various occasions they did not know what he was mad about. A number of neighbors testified that they had been at the home of appellants at various times during the time Mr. Bugg lived with them and that appellants had plenty to eat and so far as they observed appellants were kind to Mr. Bugg and accorded him nice treatment.

It is apparent from Mr. Bugg's own evidence as well as that of appellants that he was childish, high-tempered and hard to please and no doubt taxed the patience of appellants. It is our view that the preponderance of the evidence does not tend to establish any valid reason for Mr. Bugg leaving the home of appellants, except it be for the statement or threat of Mrs. Moore made to him on the occasion stated above. While that statement was improper and no doubt Mrs. Moore should have exercised more self-restraint, yet, in view of the fact that Mr. Bugg was disagreeable and no doubt provoked Mrs. Moore, the question arises—was that isolated incident sufficient to warrant the chancellor to set aside the deed? After that incident occurred both the appellants asked Mr. Bugg to stay at their home, and even tried to persuade him to go back after he had left, all of which he refused.

While it was the duty of appellants to accord Mr. Bugg kind personal treatment as well as to furnish him with proper food and maintenance, yet there was a corresponding duty on the part of Mr. Bugg to accord appellants kind treatment and respect their feelings and patience, which, it is evident, he failed to do. As to the fault of Mr. Bugg and Mrs. Moore with respect to the harsh language used by Mrs. Moore to Mr. Bugg, it appears to us that the parties are pari delicto. In these

kind of contracts the law does not require perfection, but a reasonably strict and substantial compliance with the contract is sufficient. Watson v. Gilliam, 252 Ky. 762, 68 S. W. (2d) 399. And for the grantor to have cancellation of a deed he must show by substantial evidence that the grantee failed in some substantial respect to comply with the contract and, if grantor without sufficient cause puts it out of the power of the grantees to render the service contemplated he cannot hold them responsible for their failure. Elswick v. Elswick, 220 Ky. 723, 295 S. W. 1070; Bowles' Adm'r v. Harvey, 189 Ky. 598, 225 S. W. 367.

It is the rule that the power reposed in courts of equity to set aside deeds solemnly entered into between the parties is an extraordinary one and will not be lightly exercised. Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. (2d) 4; Lacey v. Layne et al., 190 Ky. 667, 228 S. W. 1. Nor will recission be allowed for a mere slight or casual breach with no damage to plaintiff. Beattie v. Friddle, 229 Ky. 361, 17 S. W. (2d) 246.

In Hatfield v. Harris, 197 Ky. 490, 247 S. W. 729, Hatfield and his wife deeded to Harris their land for the consideration that Harris support them the rest of their lives, but reserved to themselves in the deed the right to control the land during their lives. Harris moved into the home with the Hatfields and within a few months thereafter some disagreement arose between Hatfield and the two small brothers of Harris, and Hatfield whipped or threatened to whip them and ordered them off the place. Harris resented this treatment of his brothers and he and Hatfield engaged in a quarrel, each using profanity and other demonstrations of unpleasant feelings. Some time thereafter Hatfield and his wife voluntarily left the home of Harris and brought suit to cancel the deed because of that incident, and the court held that it was not sufficient to justify the decree asked. It was also alleged that Harris failed to furnish them with proper food or other proper care and attention to Mrs. Hatfield when she was ill, and on that issue the proof was conflicting. But the personal disagreement between the families was not denied. The court held that the evidence relating to the support, care and attention of the grantors was not of that substantial character required in such cases for the cancellation of the deed.

Upon a careful review of the evidence for ourselves we are constrained to the conclusion that it fails to measure up to that character of evidence required in such cases for the cancellation of the deed. Cases supra.

Wherefore, the judgment is reversed and remanded with directions to set it aside and for proceedings consistent with this opinion.