TATE v. MURPHY.

No. 33275. Oct. 18, 1949.

Rehearing Denied Jan. 17, 1950.

Second Petition for Rehearing Denied April 25, 1950.

217 P. 2d 177.

Curtis & Blanton, of Pauls Valley, and Purman Wilson, of Purcell, for plaintiff in error.

Cook & Bingaman, H. H. Montgomery, and Hardin Ballard, all of Purcell, for defendant in error.

HALLEY, J. This action was commenced by Sinclair Murphy, as administrator of the estate of Maggie Everhart, deceased, against Ada Tate and others, to recover certain lands located in McClain county, with rents therefrom, and certain moneys and interest thereon, all of which was conveyed and transferred to Ada Tate by Maggie Everhart during her lifetime. Damages for clouding title were alleged, but this claim was abandoned. The defendants, other than Ada Tate, were disposed of by the trial court, and are not parties to this appeal by Ada Tate from a judgment in favor of the plaintiff. We shall refer to the parties as they appeared in the trial court, or by name.

Plaintiff alleged as grounds for recovery that Maggie Everhart was mentally incompetent to make the transfers complained of; that her deed to Ada Tate was a forgery and never in fact delivered; that the transfers were the result of undue influence and fraud; that the consideration therefor was inadequate; and that there was a failure of consideration and breach of contract by Ada Tate in her failure to care and provide for Maggie Everhart during the remainder of her life.

Defendant answered by general denial, and that on December 9, 1942, Maggie Everhart had voluntarily executed and delivered to Ada Tate a deed

conveying the lands in question, and transferred to Ada Tate certain money, all in consideration of an agreement by Ada Tate to furnish a home for and care and provide for Maggie Everhart during the remainder of her life; that Maggie Everhart was competent to make such transfers, and that Ada Tate had fully performed such agreement from the date of the transfers to her in December, 1942, until in January, 1944, when Maggie Everhart had become very ill, both physically and mentally, and it had become necessary to have her committed to the State Hospital for the Insane at Las Vegas, New Mexico, where she died on January 25, 1944.

Plaintiff replied that if such contract was made, it was unfair, unreasonable and unconscionable, and part of a plan by Ada Tate to defraud Maggie Everhart of her property without an adequate consideration, and that there had been a failure of consideration and breach of contract when, in January, 1944, Ada Tate had caused Maggie Everhart to be committed to the state institution as an indigent person.

Due to the various issues involved, we deem it proper to give a summary of the well-established facts relative to the lives, relationship and actions of Maggie Everhart, grantor in the transfers sought to be canceled, and Ada Tate, the grantee.

On December 9, 1942, when Maggie Everhart transferred her property to Ada Tate, the exact age of Maggie Everhart was not known, but she was over 70 years of age. For fifteen to twenty years she had suffered from kidney and bladder trouble, requiring medical care and opiates to relieve her suffering. She and her husband had come to the Indian Territory prior to statehood, and as farmers had acquired, prior to his death in 1931, a substantial amount of property. Mr. Everhart left a will, giving all of his property to his wife and making her executrix without bond. She qualified and administered the estate. There-

after, she managed her property and business affairs with the advice of her banker and attorney. She rented her farms, collected the rents, and kept a bank account at the town of Rosedale until that bank was liquidated in 1935, when she transferred her banking business to Purcell. She executed oil and gas leases, and in 1939 she sold one farm. She lived mostly in her home in Rosedale, and had various people there with her.

Having no children of their own, the Everharts generously became the foster-parents of several children of others. About 1900, Ada Tate, a girl eight or nine years of age, whose deceased father was a half-brother of Mrs. Everhart, came to live with the Everharts as a member of the family. She performed both household and farm work until, about 1908, when she married. She and her husband homesteaded land in Curry county, New Mexico, about eleven miles from Clovis. Ada Tate became the mother of eleven children, and at the death of her husband in 1935, they had acquired about one thousand acres of land, and after the death of her husband Ada Tate erected a modern home on the land and continued to manage the lands left by her husband. Maggie Everhart and her husband visited Ada Tate in New Mexica at least once, and she visited the Everharts in Oklahoma four or five times from 1908 to 1942. Maggie Everhart visited Ada Tate in New Mexico in 1937, 1938, and 1939. They carried on an irregular correspondence, none of which appears in the record, and there is no evidence that there were any disagreements between them.

In August, 1942, Ada Tate visited Mrs. Everhart at her home in Rosedale, Okla., where she had lived most of the time since the death of her husband. Roma Gowan, a witness for the plaintiff, had lived with the Everharts from the age of two years until she married, and she and her husband had lived with Mrs. Everhart at different times, the last being in 1942, when the four small children of Mrs.

Gowan appeared to have annoyed Mrs. Everhart, and she had them vacate before the visit of Mrs. Tate. At that time, Mrs. Everhart was living alone, and some of her friends and neighbors had advised her she should not live alone in the winter, since she had sick spells when she was not able to do her work. She had continued to transact her business affairs. She paid her doctor and hospital bills, her grocery bills, gas bills, insurance premiums, and taxes, all by check. She collected her rents and deposited them in the bank, and placed over a thousand dollars on time deposit. She had several wills prepared, including a codicil on account of the death of a legatee, and in one will her deceased sister was named as a legatee.

She advised some of her neighbors after Ada Tate had visted her in August, 1942, that she was going to New Mexico to live with Ada Tate. The latter part of November, 1942, she reached a neighbor and friend who had a pick-up truck, and asked him to take her to the depot in Purcell, telling him that she was going to the home of Ada Tate to live. This friend and his sister-in-law took Mrs. Everhart to the depot in Purcell and she took the train alone for Clovis, New Mexico. Upon arriving there the next day she found the phone of Ada Tate out of order, but reached her through the phone of a neighbor. Mrs. Tate took her to her home and gave her a comfortable room near the bath, and there Mrs. Everhart lived until January 14, 1944, when she was committed to the State Hospital for the Insane at Las Vegas, where she died on January 25, 1944. Mrs. Tate had undertaken to secure a nurse, but none was available; she undertook to secure hospital service at Clovis, but none was available for such a case; and she was advised by the doctor in attendance, and by the doctor who advised her at the hearing, that Mrs. Everhart would secure better care and medical service at the Las Vegas institution. It is not questioned that

Mrs. Tate gave Mrs. Everhart a good home and cared for her properly until she was adjudged insane.

On December 9, 1942, some ten days after Mrs. Everhart arrived in New Mexico, she went with Ada Tate and her daughter-in-law to Clovis. They went first to the office of a doctor, and inquired of him about an attorney, and were referred to the assistant district attorney, whose office was upstairs. Mrs. Tate went up to the office and had a deed prepared conveying the lands of Mrs. Everhart to Ada Tate. The attorney went out to the car and, with Mrs. Everhart, checked the description in the deed with that in the abstract which Mrs. Everhart had. She signed and acknowledged the deed and gave it to Ada Tate, who returned it to the attorney for forwarding to Oklahoma for record. They went to the bank, and Mrs. Everhart advised the banker that she wanted to transfer her money in Oklahoma to that bank and place it under the control of Ada Tate, except $170. These instructions of Mrs. Everhart were carried out by the banker, who was a witness in this case.

The court found that on the date of these transfers Maggie Everhart was mentally incompetent and disqualified to transact business and to execute the deed, but that she was not entirely without understanding; that she was old, weak and infirm, lacked business judgment, and was easily influenced. He further found that the oral agreement of Ada Tate to care for and support Mrs. Everhart in consideration for the conveyance of all her property was inadequate and unfair, and secured by undue influence, and was breached when Ada Tate had Mrs. Everhart committed as an indigent person; that Ada Tate had received in cash and rents $2,582.16, and was entitled to credit for disbursements for the benefit of Mrs. Everhart, including care for over thirteen months, in the sum of $2,036.20, leaving a balance due the estate of $545.83, for which judgment

was rendered for the administrator, together with judgment for the lands conveyed to Ada Tate. There was no pleading and no evidence as to the value of the services rendered to Mrs. Everhart by Ada Tate during the time care and support were furnished.

Ada Tate presents her assignments of error under the single proposition that the judgment is not supported by the evidence, but is against the clear weight of the evidence, and is contrary to law. In support of this proposition, the following issues are presented for determination:

(1) Was Maggie Everhart, on December 9, 1942, possessed of sufficient mental ability to enable her to understand the nature and effect of her acts in transferring her property to Ada Tate; that is, was she capable of understanding that her warranty deed divested her of title to her lands and vested title thereto in her grantee?

(2) Were such transfers of property induced by undue influence of fraud?

(3) Was the consideration for the transfers adequate?

(4) Was there a breach of contract and failure of consideration, when, in January, 1944, Ada Tate had Mrs. Everhart committed to the sanitarium as an indigent person?

The question of the competency or incompetency of Mrs. Everhart to make the transfers sought to be canceled is of prime importance, and we shall consider these questions as above set out. The evidence bearing upon the question of the competency of Mrs. Everhart covers an extensive record. Many witnesses were called to give their opinions, and numerous exhibits were introduced in evidence. While evidence of her mental condition prior to and after the time she made the transfers, divesting herself of her property, is important and deserves careful consideration, her mental condition at or near the time she acted is most important in determining the validity or invalidity of her acts upon that particular date. It was generally admitted by witnesses that her mental condition varied from time to time, depending largely upon whether or not she was suffering from her physical afflictions, or was under the influence of sedatives given to relieve her.

Dr. G. L. Johnson testified that he had known and treated Mrs. Everhart for from fifteen to twenty years. He conducts a hospital and had considerable opportunity to observe her and had observed and studied mental diseases. He is the only witness for the plaintiff who could qualify as an expert. He states that in his opinion she was "mentally off—psycho-neurosis"; that she was mentally weak and incompetent to transact business, and that her condition grew worse with age; and that she suffered from bladder and kidney trouble which caused severe pain and nervousness. However, in a second deposition, Dr. Johnson stated that he was unable to state what her mental condition was in 1942, and that he did not know whether or not she could understand the effect of a deed in December, 1942; that an associate had treated her the last time she was in his hospital; that she was always able to understand his questions in obtaining a history of her case; and that she transacted her own business with the hospital and paid her own bills, sometimes by check. This testimony indicates that Dr. Johnson must have been of the opinion that Mrs. Everhart's mental condition varied from time to time. If he had considered it constant and permanent, he could and would have given his opinion as to her condition in December, 1942. His latest deposition greatly weakens the testimony given in his first deposition.

Roy Glasco, an attorney who had represented Mrs. Everhart over many years, testified that he considered her incompetent to transact business after 1935; yet he admitted that he prepared two wills for her after that date. This also indicates that he must have been

of the opinion that she had lucid intervals when she was capable of understanding the business in which she was engaged.

C. B. Godard was Mrs. Everhart's banker until his bank at Rosedale was liquidated, when he moved to Purcell and became engaged in the real estate brokerage and insurance business. He testified that he thought she was incompetent, but stated that he had transacted business with her and accepted her checks for insurance policies. He further testified that he handled oil and gas leases for her and that she seemed to understand them after explanation; that she understood what the "bonus" for a lease, was, and understood that she would get the "delay rentals" under an oil and gas lease, and that upon being advised that an insurance policy for three years was cheaper than for one year, she took the three-year policy.

H. H. Dodd bought a farm from Mrs. Everhart in 1939. He stated that he paid $12 per acre, which he considered a fair price; that Mrs. Everhart received the rent for 1938 but insisted that he pay the 1938 taxes; and also complained of the charge for the abstract and agreed to pay $40 and let witness pay for the balance. He was of the opinion that she was entirely competent to transact and understand business matters.

H. S. Luper had known Mrs. Everhart for about fifty years, and regarded her as normal mentally, but could not state whether or not she could understand a deed, since he had had no business dealings with her.

Mrs. Ellen Blancett, niece of Mrs. Everhart, Mrs. Ruby Lee Murphy, Mrs. Frankie Mason, Mrs. Ed Roberts, and Mrs. Cleo Bowles all testified that in their opinion Mrs. Everhart was not competent to transact business. Mrs. L. L. (Roma) Gowan had lived in the home of Mrs. Everhart as a girl, and since she married, and did not believe she had sufficient mentality to understand a deed or to transact other business. All of these witnesses had had ample opportunity to observe and converse with Mrs. Everhart while she lived at Rosedale, Okla. Lee Weeks, who sold gasoline and serviced Mrs. Everhart's car, thought she was competent to transact business, as did A. C. Johns, who sold her groceries. He testified that she had lost her sense of direction at his store on one occasion and that he had to direct her to her home in the same block. All of the witnesses named saw her while she lived in Oklahoma and prior to November 30, 1942, when she left for New Mexico.

Among those who saw her the day she left for Clovis was I. J. Pirtle. He testified that she reached him by phone at the home of his sister-in-law, Mrs. Cora Harris, and advised him that she wanted him to take her to Purcell, where she was to take the train to New Mexico. He had a pick-up truck, and, with Mrs. Harris, went to Rosedale and picked up Mrs. Everhart and her baggage and took her to the depot in Purcell, where she boarded the train alone for Clovis. He stated that she seemed perfectly normal mentally, and capable of understanding a deed.

Mrs. Cora Harris, who accompanied Mrs. Everhart to the train at Purcell, testified that she was cheerful and normal mentally; that she had seen her most every day during her last few months in Oklahoma; that when they arrived at Purcell they went first to the bank, where Mrs. Everhart deposited some checks and drew some cash, and stated that she was going to Ada Tate's to make her home; that shortly before leaving Rosedale she stated that Roma Gowan and husband wanted her to deed them her home there, but that she was afraid to do so; that Mrs. Gowan had had her share of Mrs. Everhart's property and that she intended for Ada Tate to have what was left.

Mrs. A. V. Tate, sister-in-law of Ada Tate, testified that when Mrs. Ever-

hart arrived at Clovis she undertook to reach the Tate home by phone, which was out of order, but did reach them through a neighbor. They took her to the home of Ada Tate in the country, and soon after her arrival she stated that she wanted to transfer her property to Ada Tate and make her home with her, and Ada Tate told her she could live with her as long as she lived; that Mrs. Everhart was tired from the trip, but soon became able to live a normal life and appeared to be normal mentally; that she attended church, Sunday school, and a Christmas tree in December, 1942; that she helped with the chores and walked alone to the home of neighbors and to the mailbox.

Ada Tate, the grantee of Mrs. Everhart's property, testified that it was at the suggestion of Mrs. Everhart that she took a conveyance of her property and agreed to give her a home and care for her for the remainder of her life; that there was no influence brought to bear upon Mrs. Everhart; that she had undertaken to carry out her contract with Mrs. Everhart for support and maintenance, and had done so until Mrs. Everhart became very sick in the latter part of 1943, and finally insane; that she was advised to place her in the state institution at Las Vegas in order that she might have constant care and better medical attention than she could give her in the country; that she thought Mrs. Everhart capable of understanding what she was doing when she transferred her property.

Ada Tate and Mrs. A. V. Tate went to Clovis with Mrs. Everhart on December 9, 1942. They testified that they took her to the office of Dr. Walter E. White. He was with her some forty-five minutes and found her suffering from cystitis and high blood pressure, but testified that he found her normal mentally; that he treated her for kidney and bladder trouble in his office and also at the home of Ada Tate; she seemed normal mentally until the latter part of 1943; that Mrs. Tate inquired of him, on December 9th, about an attorney, and he referred them to Mr. Richard F. Rowley, then assistant district attorney. His office was located on the second floor of the same building, and Mrs. Tate went to his office and had a deed prepared for Mrs. Everhart to sign and took it to the car, where he met her and they checked the description with that in the abstract which Mrs. Everhart had brought. Mr. Rowley's testimony indicates that Mrs. Everhart signed the deed herself and he took her acknowledgment; that she seemed perfectly normal; that Ada Tate handed him the deed for forwarding to Oklahoma to be recorded; that he heard nothing to indicate that Mrs. Everhart was being persuaded to execute the deed, or that she did not know what she was doing.

After they left the office of Mr. Rowley, they went to the bank and Mr. A. W. Skarda, a banker for thirty-six years in Clovis, testified that Mrs. Everhart did most of the talking and arranged with him to have her funds in the Purcell bank transferred to his bank, including the sum she had on time deposit; that she seemed normal in every way, and that it was his opinion that she was mentally competent to transact business and understand what she was doing.

Dr. I. D. Worrell, optometrist, of Clovis, testified that he examined Mrs. Everhart for glasses on January 4, 1943, and that her mentality seemed good for a person of her age; that she read charts and was in the office for perhaps forty minutes, and on January 14th returned for her glasses and was there about twenty minutes.

Mrs. M. A. Wakely testified that she had known Mrs. Everhart for several years and had visited with her most every day before she left for New Mexico, including the day before she left and while she was packing; that Mrs. Everhart told her she was going to "her girl", Ada Tate; that Mrs. Everhart was normal mentally except when

she was sick or taking medicine; that she thought she was capable of executing a deed and understanding a deed; and that she had advised her to live with Ada Tate, since she thought she should not live alone during the winter.

There is no question but that Mrs. Everhart was insane on January 13, 1944, when she was examined by Dr. A. L. Dillon of Clovis, New Mexico, who testified that she was insane on that date and described her type of insanity as "dementia paralytic", which he explained to mean that the patient is suffering pain and worried—a mental deterioration or degeneration. He had never seen her before that day and could not make any accurate estimate as to how long she had been so afflicted. He could not say what her condition was on December 9, 1942. He further testified that in her condition at the time he examined her, she could not be properly cared for in any home, and that the humane thing was to send her to the sanitarium at Las Vegas. His testimony is amply corroborated by that of Sheriff R. N. Whitely who took Mrs. Everhart to Las Vegas the next day, January 14, 1944.

Ada Tate had testified that during the last six weeks in her home Mrs. Everhart required constant attention, and that she and other members of her family had reached the end of their endurance in sitting up with her at nights and trying to care for her.

Several witnesses testified that they came into contact with Mrs. Everhart while she lived in New Mexico, and all of them were of the opinion that she was mentally normal up to the latter part of 1943, when she became very sick. We shall not discuss their testimony, but it indicates that she enjoyed a considerable period after December, 1942, of fairly good health and understanding. She pieced an entire quilt during that time.

This court has often announced the test of a person's ability to make a valid deed or contract. The rule is announced in an early case, Miller v. Folsom, 49 Okla. 74, 149 P. 1185, as follows:

"The test of capacity to make a deed is that the grantor shall have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting. To invalidate a deed it must appear that the grantor was incapable of comprehending that the effect of the deed, when made, executed and delivered, would be to divest him of the title to the land set forth in the deed."

In Scott v. Scott, 131 Okla. 144, 268 P. 245, it is stated:

"The test of capacity to make a deed is that the grantor should have the ability to understand the nature and effect of the act in which he is engaged, and the business he is transacting. He may be old; he may be enfeebled by disease; he may be erratic, irritable, and changeable in his views; he even may be irrational upon some topics, but, in the absence of fraud, he may still execute a valid deed."

In the more recent case of Antle v. Hartman, 193 Okla. 524, 145 P. 2d 756, it is said:

"Fragmentary evidence of isolated instances indicating failing memory was insufficient to overcome evidence that grantor was mentally competent at time of executing deed."

In the first syllabus of Marten v. Wagner, 198 Okla. 273, 178 P. 2d 618, the importance of mental condition at the time when a convevance is made is announced as follows:

"The test of capacity to make a deed or conveyance is that the grantor shall have ability to understand nature and effect of the act at time conveyance is made."

In 26 C. J. S. Deeds, sec. 208, subsection (b), we find the following statement:

"To justify the setting aside of a deed for mental incapacity, the evidence must be sufficient to show that grantor was so lacking in mental ability that he could not reasonably exer-

cise judgment and discretion in regard to the particular business at hand. Such incapacity must ordinarily be established by a preponderance of the evidence, or by clear, satisfactory and convincing evidence."

The trial court found that Mrs. Everhart was a person of weak mentality, but not entirely without understanding. Her mental incompetency had not been judicially determined prior to January 13, 1944. She conveyed her property on December 9, 1942. In Mullen v. First Guaranty State Bank of Crossplains, Texas, 113 Okla. 84, 239 P. 161, this court had under consideration the capacity of one of weak mentality to execute a valid contract, and in the body of the opinion said:

"Therefore, to render a contract voidable on account of the mental incapacity of one of the parties to it, it is not enough that such party was at times, from whatever cause, lacking in sufficient sanity to understand what he was doing, but the evidence of his defective intelligence must relate to the immediate time of making the contract. A deed, mortgage or other conveyance or contract made by an insane person, but during a lucid interval before his incapacity, has been judicially determined, is valid and enforceable. . . ."

There is evidence that Mrs. Everhart had at one time lost her sense of direction; her memory was bad at times, and once she lost track of the days of the week; that she suffered hallucinations pertaining to spiritual matters, and at times permitted others to impose upon her generosity, and often changed her mind. On the other hand, there is undisputed evidence that at other times she knew what she was doing and was fully able to understand the effect of a deed. There is no evidence that she did not fully understand that when she executed a deed and delivered it, she had parted with title and that the land was thereafter vested in her grantee. There were intervals between her sick spells and the effects of sedatives, when she is shown to have been fully capable of understanding the nature and effect of her acts and the business in which she was engaged. She carried a bank account, paid her grocery bills, gas bills, insurance premiums, hospital and doctors' bills, and taxes by check; there is no evidence that she ever overdrew her account or left a bill unpaid. At times she did not know the exact amount of her bank balance, but this fact is not strong evidence of mental incompetency for a woman of her age and background. It will be noted that not a single witness who saw Mrs. Everhart within ten days of the date of her transfers testified that she was mentally incompetent; all who saw her on the day when she transferred her property to Ada Tate were of the opinion that she was competent at that time. On December 9, 1942, she did what she had stated to a friend she intended to do just before she went to New Mexico. Upon her arrival at Clovis she immediately expressed a desire to turn her property over to Ada Tate and make her home there for the remainder of her life. We conclude that the finding of the court that she was incompetent on December 9, 1942, is not supported by the evidence, but is against the clear weight of the evidence.

The court found that the transfers by Maggie Everhart to Ada Tate were the result of undue influence, and that a confidential relationship existed between them at the time of the transfers. The case of Antle v. Hartman, supra, was cited and quoted from by this court in Williams v. Church, 200 Okla. 646, 198 P. 2d 995, as follows:

"Undue influence to vitiate a conveyance must destroy the grantor's free agency at the time the conveyance is executed and must, in effect, substitute the will of another for that of the grantor."

and:

"Mere suspicion, conjecture, possibility or guess that undue influence

has been exercised is not sufficient to defeat a grant of conveyance otherwise valid."

In Canfield v. Canfield, 167 Okla. 590, 31 P. 2d 152, the term "undue influence" is defined as follows:

"The word 'undue' when used to qualify 'influence', has the legal meaning of 'wrongful', so that 'undue influence' means a wrongful influence, but influence acquired through affection is not wrongful."

We have carefully reviewed all of the evidence, and find that there is no evidence to support the finding of the court that Ada Tate exercised undue influence to secure the transfers complained of. The opportunity for the exercise of undue influence certainly did exist, but we are not justified in concluding that it was exercised merely because the opportunity existed. Ada Tate denies emphatically that she ever solicited the conveyance, or in any manner influenced her aunt in that respect. We have noted that in at least four wills shown in the record, Mrs. Everhart made Ada Tate a devisee. There is no evidence of any disagreement between them, or that Mrs. Everhart ever complained of the actions of her niece. We hold that the finding of the trial court in this respect is not supported by the evidence.

The oral agreement of Ada Tate for care and support was admittedly the only consideration for the transfers. Was this consideration adequate? We note that the finding of the trial court on this point is based upon the assumption that Mrs. Everhart was incompetent. The value of the property conveyed was slightly over $7,000. The court found that Ada Tate was entitled to more than $2,000 for expenditures for about thirteen and one-half months, and that the value of her care and support was worth $100 per month. Suppose Mrs. Everhart had lived for five or ten years after their agreement was made? They must have assumed that as Mrs. Everhart grew older she would

require more medical attention and care, and had she lived five years longer her estate would have been consumed and Ada Tate would have been obligated to use her own funds to care for Mrs. Everhart. There is not one word of testimony indicating that Ada Tate would not have carried out her agreement had Mrs. Everhart recovered from her last illness and regained her mental faculties.

In the cases of Weitz v. Moulden, 109 Okla. 119, 234 P. 583; Bush v. Bush, 142 Okla. 152, 286 P. 322; and Moffatt v. Moffatt, 195 Okla. 498, 159 P. 2d 531, this court has recognized the adequacy of a promise to care for and support a grantor for the remainder of his life, in the absence of fraud or undue influence and unless the consideration is so grossly inadequate as to shock the conscience of the court.

In considering the adequacy of consideration in cases of this nature, it should be kept in mind that conditions existing at the time the contract is made are controlling. In the case of Maude Dingler, Respt., v. Noah Ritzius et al., 42 Idaho, 614, 247 P. 10, the rule is announced by the Supreme Court of Idaho as follows:

"In contract to care for person until death, subsequent events cannot enter into fairness of contract or adequacy of consideration, since there is an element of uncertainty, and adequacy of consideration and fairness must be viewed from standpoint of time of its making."

The Court of Appeals of Kentucky, in the cases of Meece v. Colyer, 166 Ky. 581, 179 S. W. 579, and Dunaway v. Dunaway, 32 Ky. L. Rep. 29, 105 S.W. 137, announced the rule upon this subject in the following language:

"The test is: Was it fair and reasonable when entered into? The grantor might have lived several years longer than he did, and at the time the deed was made, it seemed likely that he would live for several years. In view of the condition of the grantor's health,

because of his physical infirmity, and the probability that he would in time become more and more helpless, and a charge of constant care and attention, the agreement of the grantee to support him the balance of his life, and to decently inter him, made a sufficient consideration to uphold the deed."

Again, in Tunks et al. v. Vincent et al., 241 Ky. 379, 44 S. W. 2d 282, it was said:

"The fairness of this transaction is beyond question. No one could tell how long the grantor would live, and the probable burden assumed by the grantee is not to be measured by what subsequently transpired, but by the situation at the time of the transaction."

At the time Ada Tate made the agreement to furnish Mrs. Everhart a home for the remainder of her life, no one knew how long Mrs. Everhart would live or what care and expense she would require, and the adequacy of the consideration here should be judged by conditions as they existed on December 9, 1942; and so judged, we find that the consideration was adequate.

Was there a breach of contract and a failure of consideration when Ada Tate had Mrs. Everhart committed to the hospital for the insane in 1944? The examining physician advised such action for the good of Mrs. Everhart. One doctor said it was the humane thing to do. For six weeks Ada Tate and her family had attended Mrs. Everhart day and night until they became exhausted. She lived only eleven days after commitment. Ada Tate testified that she offered to pay the expenses at the hospital, but was advised that it was state-supported and that she was not required to pay for any services there. We find no evidence of refusal on the part of Ada Tate to pay, and the evidence clearly shows that her action was for the best interest of Mrs. Everhart after she became insane in 1944.

The general rule upon this subject is announced in 26 C.J.S., sec. 21, page 197, as follows:

"In order to justify cancellation of a deed, there must be an entire failure or refusal to perform the agreement, or at least a substantial failure to perform the contract, and such entire or substantial failure or refusal must be in respect of such material matters as would render the performance of the rest a thing different from what was contracted."

The same rule is announced in the case of Meyer v. Meyer, 247 Ill. 535, 93 N.E. 341, by the Supreme Court of Illinois in the first syllabus as follows:

"A deed made in consideration of the support of the grantor for life will only be set aside in equity where there has been an entire failure or refusal to perform the agreement, or at least such a substantial failure to perform as will render the performance of the rest a thing different from what was contracted for, and a slight or partial neglect to observe some of the terms of the agreement does not justify rescission."

In Moore et al. v. Bugg's Executor et al., 274 Ky. 135, 118 S.W. 2d 185, the Supreme Court of Kentucky announced the rule in the following language:

"Where grantor conveys realty on consideration that grantees support grantor during life, the law does not require perfection, but requires only a reasonably strict and substantial compliance with the contract."

The only case that has come to our attention where the grantor became insane and had to be committed to an institution is that of Penas v. Cherveny et al., 135 Minn. 427, 161 N.W. 150, in which the court said:

"The parent having been adjudged insane and committed to the hospital for the insane, held, that during her detention in the hospital the provisions

of the contract for the payment and delivery to her of money or property for her support are suspended, and that during such time such obligation cannot be enforced by her guardian."

It is not contended that Ada Tate did not perform her contract faithfully until Mrs. Everhart became insane, and she was advised that it was best for Mrs. Everhart and all concerned to place her in the state institution. The evidence shows that Ada Tate would have paid for the services there rendered to Mrs. Everhart had it been necessary that such payment be made. The obligation of Ada Tate terminated on January 25, 1944, when Mrs. Everhart died. We find no breach of contract or failure of consideration that would justify cancellation of the deed to Ada Tate.

It is urged that a fiduciary relationship existed between Ada Tate and Mrs. Everhart, but such was not established. However, it was, in our opinion, established by convincing testimony that the transaction between them was fair, voluntary, and free from any taint of fraud, coercion or overreaching. Harjo v. Collins, 146 Okla. 131, 293 P. 179, 72 A. L. R. 1034.

We have said many times that in a case of equitable cognizance we will weigh the evidence and, if the judgment below is clearly against the weight thereof, we will reverse the same and enter or cause to be entered the judgment that the trial court should have rendered. Elling v. Kohler, 150 Okla. 129, 3 P. 2d 161; Wilson v. Koury, 199 Okla. 555, 188 P. 2d 349; Ward v. Ward, 197 Okla. 551, 172 P. 2d 978. This we have done in this case, and we conclude that the judgment of the trial court is not supported by the evidence and is clearly against the weight thereof. This case is therefore reversed and remanded, with directions to enter judgment for the defendant Ada Tate, quieting title to the lands involved in her.

WELCH, CORN, GIBSON, JOHNSON, and O'NEAL, JJ., concur.