[No. 33705. Department One. April 18, 1957.]

ROSE BINDER, *Respondent*, v. EDWARD BINDER *et al.*,
*Appellants.*[1]

*Dean & Williams*, for appellants.

*Victor J. Felice*, for respondent.

ROSELLINI, J.—The respondent brought this action to cancel a deed which she had made to her son, alleging that the deed had been obtained through fraud and undue influence and without consideration. The facts out of which the controversy arose can be summarized as follows:

[1]Reported in 309 P. (2d) 1050.

Some twenty-five years ago, the respondent and her husband, A. E. Binder, who died in 1949, acquired a block of property in Spokane, consisting of ten lots. In 1936, A. E. Binder relinquished his interest to the respondent by quitclaim deed. The respondent and her husband reared their eight children in a large brick house which stood on two of the lots and in which the respondent now lives with an unmarried son, Leo, aged twenty-three, and another son, Louis, whose wife and children also reside with the respondent. Another son, Joe, lives with his family across the street from the respondent.

In 1940, A. E. Binder converted a barn standing about one hundred twenty-five feet from the brick house into living quarters; and during the war, this structure was rented for twenty-five dollars a month, including utilities. After the war, the appellant Edward J. Binder, who is also a son of the respondent, moved into the small house with his then wife and, by agreement with his father, paid ten dollars a month rental. The electricity and water bills were paid by his parents. Later, Edward J. Binder, who will hereafter be referred to as the appellant, was divorced from his first wife; and in 1948, he was married to his present wife, Della Binder, who, with her young son by a previous marriage, came to live with him in the small house. In 1949, another child was born. The appellant continued to pay ten dollars per month for rent until April, 1950, when, according to his testimony, the respondent entered into an oral agreement to sell six of the lots and the small house to the appellant for a consideration of one thousand dollars, to be paid one hundred dollars down and fifteen dollars per month, without interest.

On April 27, 1951, the respondent executed a quitclaim deed in favor of the appellant and his wife, and a sale agreement, whereby she agreed to sell six lots for the sum of one thousand dollars. Receipt of two hundred eighty dollars was acknowledged, and the agreement provided that the balance was to be paid at the rate of fifteen dollars or more per month. No provision was made for interest. These in-

struments were drawn up by an attorney, at the request of the appellant, and were executed in his office.

According to the terms of the sale agreement, the deed was to be placed in escrow until the balance was paid. However, the original of the sale agreement and the deed were turned over to the appellant, and in February, 1952, he recorded the deed. Five days later, he mortgaged the property to secure a loan of seventeen hundred dollars. As additional security, he gave a chattel mortgage covering his 1948 Oldsmobile sedan, household furnishings and appliances, and other personalty. In 1954, an additional loan of two thousand dollars was obtained, part of the proceeds of which were used to pay off the first mortgage, and the same property was given as security. The appellant did not advise the respondent that he had mortgaged the property, and she did not learn of the fact until this action was instituted.

When A. E. Binder died in 1949, he left his foundry business (the St. Louis Brass & Iron Works) to Joe, Louis, and the appellant, and his community interest in a locker business, which was sold for twenty thousand five hundred dollars, to his other children. From her interest in this business, the respondent receives one thousand dollars per year under the terms of the sale contract, and the five children also receive one thousand dollars, which is divided among them.

The three sons who inherited the foundry did not get along well together and were unable to co-operate in the management and operation of the business. It was eventually placed in receivership by the appellant, and was purchased in 1952 by Joe for forty-five hundred dollars. After relinquishing his interest in the business, from which he had derived from sixty to seventy-five dollars per week, the appellant took a job as a draftsman, which he now holds and which pays him approximately three hundred seventy-five dollars per month.

In addition to the income which she receives from the sale of the locker business and the sale of the house and lot to the appellant, the respondent receives ten dollars per

week rent from each of the two sons who are living with her. Her son Joe has contributed money for the payment of taxes and assessments on her property. Louis and Leo help her around the house. It appears that the appellant has contributed little to his mother in the way of financial aid or labor.

The testimony of the two parties concerning the circumstances surrounding the execution of the deed and sale agreement was sharply conflicting. In substance, the respondent testified that she had never intended to sell or give the property in question to the appellant; that she had never executed the deed which bore her signature and was notarized by the attorney; that she had never received or endorsed a check for ninety dollars (purportedly a part of the down payment), which also bore her signature; and that the fifteen dollars per month was paid as rent and not as house payments. She admitted going to the attorney's office and signing the sale agreement, but denied any knowledge of its contents. She stated that she had not asked to have it read to her. She signed the agreement, she said, because the appellant had told her that if she continued to allow Joe to pay the taxes on her property, he would take it away from her. She admitted on cross-examination that she did not believe this at the time. The appellant asked her not to tell any of the other children about the transaction, and she agreed to keep it secret. She had gone to appellant's house each month to collect the "rent" and signed receipts which he kept intact in a receipt book and each of which bore the notation "payment for (month) on house and lots," or "payment for (month) on house and 6 lots." However, she testified that she had never read these notations because the writing was too small and she did not have her reading glasses with her.

Although sometime prior to September 9, 1954, she had joined with the appellant and his wife in a petition to vacate an abandoned railroad right of way adjacent to her lots and those which she had deeded to the appellant and his wife, she denied having any notice of their claim prior to the receipt of a letter dated September 29, 1954, from an attorney

representing a concern which had put in a sewer system on her lots. The letter stated that the court house records showed title to these lots to be in her son, E. J. Binder, but the writer had found, on checking the deed, that the court house records were wrong and that she still retained title to the lots in question. The respondent showed this letter to Louis, who in turn showed it to Joe. Joe contacted an attorney, and this action followed.

The respondent testified that she had handled her own business affairs since her husband's death, but that she sometimes discussed them with one or another of her children. She trusted both Joe and the appellant and did not believe that Joe would steal from her. She did not testify to any threats or coercion on the part of the appellant, aside from her testimony that he had stated that if Joe continued to pay the taxes on her property, he would take it away from her; that he had asked her to keep the transaction a secret from the other children; and that he had said, when they went to the lawyer's office to sign the paper, that he was in a hurry to get back to work.

According to the appellant's version of the transaction, in the spring of 1950 he and his wife had told the respondent that they would like to build a house sometime in the future and were interested in acquiring some property for this purpose. They asked her if she would be willing to sell them some of her lots. She said she would think about it. A week or so later, they brought the subject up again and she said that she would be willing to sell them all of the lots lying "behind the arbor," that four lots were all she needed and she was tired of paying taxes on the unused property. She had not made up her mind at that time about the price. A few days later, she told them she would be willing to sell the lots and the little house to them for one thousand dollars. They asked if a down payment of one hundred dollars would be enough, and she said that it would. This down payment was made in the form of a check for ninety dollars and ten dollars in cash.

The appellant suggested that, since they were buying the house, the monthly payments should be greater than the

rent they had been paying and suggested fifteen dollars a month, to which the respondent agreed. She also agreed to keep the matter a secret because if the others knew about it, they would try to interfere. He quoted her as saying, "If I want to do something for you kids, it is none of their business."

The appellant testified that he did not know the true value of the property but supposed it was around seven hundred to seven hundred fifty dollars. He based this assumption on the valuations shown on the tax receipts. At that time, the railroad right of way was in use and two or three trains passed their property each day. There was no means of ingress and egress except across the lots retained by the respondent.

Although the down payment was made in April, 1950, and the monthly payments of fifteen dollars were paid thereafter, the appellant did not get around to reducing the agreement to writing until a year later. He himself contacted the attorney and made an appointment; and to the best of his recollection, the instruments were drawn up while he and his mother were in the attorney's office. They requested a quitclaim deed because that was the type of deed which A. E. Binder had made to the respondent. The two-hundred-eighty-dollar down payment recited in the contract consisted of the one hundred dollars paid in the previous year, plus the fifteen-dollar monthly payments which had been made since the oral agreement was entered into.

The appellant also testified that he retained the deed and sale agreement because of the fear that, if the respondent took them to her home, one of the other children would see them. (However, it appears that the respondent had a safe-deposit box where the instruments could have been placed for safekeeping.) He was unaware of the fact that he should have placed the deed in escrow, and he recorded it so that there would be a record in case the deed were destroyed by fire. It is significant, however, that the property was mortgaged within a week after the deed was recorded. It was also after the mortgage was executed that he began to keep a receipt book. He stated that, until he had talked to Mr.

Patten, the man from whom the loan was secured, he had not realized the importance of keeping records.

He testified that, whenever the respondent signed a receipt, he called her attention to the fact that this was a payment on the house and lots; that he and his wife frequently asked her if she was sure she was satisfied with the arrangement and cautioned her not to talk to the other children about it. They were concerned that she might have a change of heart after the railroad was abandoned and the right of way vacated. At this time, new homes were being built in the vicinity and they were aware that the value of the property was rising.

The trial court found that the property in 1950 and 1951 had a value of thirty-five hundred dollars; that the appellant exerted undue influence on the respondent, and that the gross inadequacy of consideration constituted overreaching. The deed and sale agreement were ordered set aside and the property restored to the respondent, and the appellant was given "credit" for the ninety-dollar down payment, the extra five dollars per month which he had paid since the contract was entered into, and the sums which he had paid for taxes and assessments.

The appellant maintains that the evidence was insufficient to sustain the finding of undue influence, and we are inclined to agree. It is significant that there was no attempt to show that the respondent was mentally incompetent or even weakminded. She was sixty-three years of age in 1951 and sixty-seven at the time of the trial, and at that time her memory was excellent on all matters except the transaction in question, and she admitted that she could have read the instruments, or had them read to her, if she had asked. The attorney testified that he was virtually certain that he had explained the instruments and the acknowledgment, as this was always his custom. If she did not understand the nature of her undertaking, it was due to her own indifference, not to her incapacity to understand or to any misrepresentation or coercion on the part of her son.

Mental competency is presumed; and in order to establish mental incompetency, fraud, or undue influence, the

evidence must be clear, cogent, and convincing. *Tecklen-burg v. Washington Gas & Electric Co.*, 40 Wn. (2d) 141, 241 P. (2d) 1172. In that case, speaking of the rules applicable to the question of undue influence, we said:

"In many cases where a contract or deed has been the subject of attack, it has been claimed that the party making such instrument was mentally incompetent so to do, and also was the victim of undue influence. It is recognized that a competent person may be subjected to undue influence and his conduct be governed thereby, though such a result is less likely in the case of a strong-minded person than one mentally weak and infirm. A person is regarded as mentally incompetent when he does not possess sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the particular transaction in which he is engaged. He has been unduly influenced if the actor goes beyond persuasion, the influence exerted overcomes the will of the contractor or grantor, he is rendered incapable of acting upon his own motives, and his free agency is destroyed with reference to the particular transaction questioned. [Citing cases.]"

In order to sustain the finding of undue influence in this case, where no mental incompetency has been shown, the record must reveal that the respondent was so completely under the influence of the appellant that she was incapable of acting on her own motives:

"Influence becomes undue only when it overcomes the will of the grantor; when the grantor acts under such coercion that his own free agency is destroyed. The grantor's views may be radically changed by the influence exercised, but so long as he is not overborne and rendered incapable of acting upon his own motives, his acts are his own acts, not those of another." *Parr v. Campbell,* 109 Wash. 376, 186 Pac. 858, quoted in *Vossen v. Wilson,* 39 Wn. (2d) 906, 239 P. (2d) 558.

By her own testimony, the respondent did not believe the appellant's statement that her son Joe would, if she continued to allow him to pay the taxes, take her property away from her. Whether he would make such an attempt was a matter of speculation, and the respondent was in as good a position as the appellant to judge her son's intentions.

■ So far as the record discloses, her motives in transferring the property to the appellant were her own, not those of the appellant, who was in no better position to influence her than were her other sons, nor indeed, in as good a position as those who lived in the house with her, gave her money, counseled with her, and helped her around the house. It is not undue influence for a child to persuade or solicit his parent to make a conveyance, so long as the parent is not overborne or rendered incapable of acting upon his own motives. *Parr v. Campbell, supra.*

■ In arriving at the conclusion that the evidence is. insufficient to sustain a finding of undue influence, we bear in mind that the testimony of the parties was in direct conflict on many matters, that both of them testified to matters which were discredited by other evidence, and that where conflicting testimony is involved, the findings of the trial court are entitled to great weight. But our decision is based upon a failure of evidence, not a preponderance of it. The respondent failed to testify to facts on which a finding of undue influence, under the rules we have stated, could be predicated.

The respondent urges, however, that, even though the facts testified to may not meet the legal definition of undue influence, the trial court's conclusion was correct under the holding of *Downing v. State*, 9 Wn. (2d) 685, 115 P. (2d) 972, wherein we said that although, as a general rule, inadequacy of price is not sufficient, of itself, to authorize a court of equity to set aside a deed, unless the price is so grossly inadequate as to shock the conscience of the court, inadequacy of price when coupled with other inequitable incidents, such as actual or constructive fraud, may afford proper ground for relief. In that case, an agent of the state had represented to the plaintiff, a woman seventy-five years of age, that if she did not accept two hundred dollars in payment for her land which the state proposed to condemn for a right of way, she would not be able to get that much in a condemnation proceeding. Later, he raised the offer to six hundred dollars, and the plaintiff accepted this offer. She later learned that her land had been diminished in

value some three thousand dollars. Although the statements made by the agent might properly be termed statements of opinion rather than of fact, we held that, in view of the situation of the parties, the plaintiff was entitled to believe the agent, and that his acts amounted to constructive fraud. This, taken in conjunction with the inadequate consideration, was sufficient to justify the court in setting the conveyance aside.

The difference between that case and this should be immediately apparent. In that case, the value of the land was misrepresented. The record in this case is devoid of any evidence that either of the parties to this action knew the true value of the land, or that the price was set by the appellant. And, of course, the transaction in that case was not between a mother and son. While the contract involved here is unusual, in that it contains no provision for interest, and the parties made no attempt to ascertain the true value of the land, it must be remembered that the appellant earned only three hundred fifty to three hundred seventy-five dollars per month, and had a family of four to support. The house in which he lived was crude. As we said in *Lehman v. Columbia Fire Ins. Co.*, 188 Wash. 640, 63 P. (2d) 442, and in *Parr v. Campbell, supra,* love and affection is a sufficient consideration to sustain a conveyance from a parent to a child.

In making this contract, the respondent was not conveying to one child all, or substantially all, of her property. She and five of the children were receiving income from the sale of a business formerly owned by the respondent and her husband, and she retained four lots and the family home (a ten-room house), in which two of the children were living with her. Under the circumstances, the conveyance of a small house and six unimproved lots, having no convenient means of access, for one thousand dollars does not appear so highly unjust and unreasonable as to "shock the conscience of the court."

We conclude, therefore, that the trial court erred in setting the transaction aside. With their answer, the appellant and his wife tendered a quitclaim deed to the property and

152

asked that the court order the execution of a new deed, to be placed in escrow until the balance is paid. The mortgagee was not joined in this action, and if such a decree were entered, it would affect his rights adversely. The necessity of placing the deed in escrow can be avoided, however, since the appellant states in his brief that he is prepared to pay the balance due on the contract upon the rendering of judgment in his favor.

The judgment is reversed and the cause remanded, with directions to enter a judgment in conformity with the views expressed herein.

SCHWELLENBACH, DONWORTH, FINLEY, and FOSTER, JJ., concur.