Mont R. ANDERSON, Personal Representative of the Estate of Cloyd H. Brinkerhoff, Lena Brinkerhoff, and Mark J. Brinkerhoff, Plaintiffs and Respondents,

v.

Elsie BRINKERHOFF, Golda B. Adair, Warren Brinkerhoff, Arlene B. Goulding, and John Does I thru V, Defendants and Appellants.

No. 880122–CA.

Court of Appeals of Utah.

June 9, 1988.

**96**

Hans Chamberlain (argued), Cedar City, for defendants and appellants.

Willard R. Bishop (argued), Cedar City, for plaintiffs and respondents.

Before BILLINGS, GARFF and ORME, JJ.

## OPINION

BILLINGS, Judge:

Respondents initiated this action to quiet title in real property and for specific performance of a contract. The trial court found in favor of respondents and specifically enforced the contract, allowed respondents to make up past-due payments, and voided certain instruments signed by Elsie Brinkerhoff. Appellants contend the court committed reversible error in sua sponte finding Elsie incompetent, and thereafter in failing to appoint a guardian ad litem, but instead continuing the trial. Appellants ask this court to reverse the trial court and find the 1966 contract abandoned, and declare the 1979 joint tenancy deed and the 1980 conveyances from Elsie to her five children binding and enforceable. We affirm.

On her husband's death, Elsie Brinkerhoff became the owner of over 1,970 acres of real property located in Kane County, Utah. Cloyd and Mark Brinkerhoff, two of Elsie's sons, used Elsie's land in their farming and grazing business. In 1966, Elsie, represented by independent counsel, entered into an agreement to sell the property to Cloyd and Mark. The contract required Cloyd and Mark to pay a minimum of $53,388 at the rate of $2,000 per year, without interest, for the rest of Elsie's life. The contract provided for an escrow account to hold the deeds and process the payments.

While the contract was not signed until 1966, payments of $2,000 for 1964 and 1965 were made. However, the precise terms of the contract were never followed. All documents were not placed in escrow, and Cloyd and Mark often made payments by paying Elsie's bills or giving her money directly.

The contract provided that upon default, and a failure to remedy the default within 30 days, Elsie had the option to demand a redelivery of all the deeds and escrow documents, and the surrender of the property, with all sums paid to be forfeited as rent and liquidated damages under this forfeiture clause. Notice of default was required if the default of the contract was other than the payment of principal and interest. Elsie never complained about non-payment nor demanded return of the deeds or documents, and Mark and Cloyd[1] have retained possession of the land.

In June 1979, Elsie purportedly executed a joint tenancy deed, which granted title in the property to herself, Cloyd, and Mark. The circumstances surrounding the execution of the deed are unclear, but the transaction appears to have been made at the request of Cloyd. Elsie and Mark claim no recollection of the deed's inception or execution. While the deed was recorded in Kane County, respondents claim that the deed did not conform to the contract, and

was not properly notarized, delivered or accepted.

On October 14, 1979, Cloyd died, vesting record title to the property in Elsie and Mark, each with an undivided one-half interest. On August 15, 1980, Elsie signed an affidavit severing the joint tenancy, and executed a deed from herself to five of her children: Golda Adair, Warren Brinkerhoff, Arlene Goulding, Charles Brinkerhoff, and Betty Esplin. She was not represented by counsel when she executed this deed. The deed gave each child an undivided one-fifth interest of the one-half record interest Elsie maintained in the land. The other one-half interest remained with Mark. A separate deed of trust and promissory note were prepared for each of the five children. Each note was for $10,000, payable at a rate of $30 a month, making the total to be paid by the five children $50,000. The trust deeds were recorded and an escrow account established to receive the children's payments and to hold the deed.

On June 21, 1982, Cloyd's personal representative and his widow, Lena, filed suit seeking to enforce the 1966 contract and to quiet title in the property. During the trial, the court, sua sponte, determined that Elsie did not fully comprehend the matter before the court. Elsie was not represented by counsel at trial. Nevertheless, the trial proceeded with the court, rather than an appointed guardian ad litem, "looking out for Elsie's interests."

After trial, the court ruled that as of 1970 Elsie was not legally competent and, therefore, that all legal documents signed by her from that time forward were invalid. Consequently, the court's ruling voided the 1979 joint tenancy deed and the 1980 conveyances to the other five children. Alternatively, the court found that the 1979 joint tenancy deed and the 1980 conveyances were not the result of Elsie's free will, but were brought about by the undue influence of family members. The court further found that the 1966 contract was in

---

**1.** Cloyd died in October of 1979. His wife, Lena, has remained in possession of Cloyd's interest since his death.

full force and effect. The court determined that $50,655.11 was owed to Elsie, which respondents subsequently paid.

Appellants contend the court committed reversible error in raising the issue of Elsie's incompetence sua sponte. Furthermore, they argue the evidence does not support a finding of incompetence. Appellants also contend that if Elsie was incompetent, then the court's failure to appoint a guardian ad litem before continuing the trial constitutes reversible error. Appellants ask this court to reverse the trial court and declare the 1966 contract abandoned, and the 1979 joint tenancy deed and the 1980 conveyances from Elsie to her five children binding and enforceable.

## STANDARD OF REVIEW

We accord the trial court's findings great deference, and will not disturb those findings unless they are against the clear weight of evidence. *Adair v. Bracken*, 745 P.2d 849, 851 (Utah Ct.App.1987). Therefore, we set aside the factual findings of the trial court only if they are clearly erroneous. *See Ashton v. Ashton*, 733 P.2d 147, 150 (Utah 1987).

## VALIDITY OF THE 1966 CONTRACT

There is no dispute that the 1966 contract, wherein Elsie sold the ranch to her two sons, Cloyd and Mark, was not performed precisely according to its terms. The contract and deeds were not deposited in an escrow account, and payments, when made, were often made directly to Elsie or by paying her bills or making deposits into her bank account. The dispute concerns whether the parties' conduct establishes a waiver of precise performance of the contract or an intent to abandon the contract.

■ Waiver is defined as the voluntary and intentional relinquishment of a known right. *Morgan v. Quailbrook Condominium Co.*, 704 P.2d 573, 578 (Utah 1985); *Bjork v. April Indus., Inc.*, 547 P.2d 219, 220 (Utah 1976); *Barnes v. Wood*, 750 P.2d 1226, 1230 (Utah Ct.App.1988). Waiver can be implied from conduct, such as making payments or accepting performance which does not comport with contractual require-

ments. *Udevco Inc. v. Wagner*, 100 Nev. 185, 678 P.2d 679, 682 (1984); *see B.R. Woodward Marketing, Inc. v. Collins Food Serv., Inc.*, 82 Utah Adv. Rep. 35, 37, 754 P.2d 99 (Ct.App.1988).

The failure of the parties to adhere to the precise terms of the contract, combined with the parties' failure to give any notice of their intention to insist on strict compliance with the terms of the contract, is ample evidence to support a finding that the parties waived strict compliance with the contractual terms. *See Pack v. Hull Dev. Co., Inc.*, 667 P.2d 39, 40 (Utah 1983); *Tanner v. Baadsgaard*, 612 P.2d 345, 347 (Utah 1980); *Call v. Timber Lakes Corp.*, 567 P.2d 1108, 1109 (Utah 1977). Moreover, even if the parties had not waived strict compliance, Elsie's failure to comply with the contract's provision for termination would mean the buyer's rights were not effectively terminated.

Abandonment is the intentional, unequivocal relinquishment of a benefit due from another. *Pitcher v. Lauritzen*, 18 Utah 2d 368, 423 P.2d 491, 493 (1967). A purchaser's intent to abandon rights to property under a contract must be clearly inconsistent with an intention to continue the use of the property. *Adair*, 745 P.2d at 851; *Forsyth v. Pendelton*, 617 P.2d 358, 361 (Utah 1980). There must be a substantial failure to perform the material matters of the contract. *Tate v. Murphy*, 202 Okl. 671, 217 P.2d 177, 187 (1949). When dealing with contract rights, abandonment turns on questions of fact and is to be determined from the circumstances of the case, including the intentions and other actions of the parties. *Adair*, 745 P.2d at 851; *Timpanogos Highlands, Inc. v. Harper*, 544 P.2d 481, 484 (Utah 1975).

■ The court made the following findings to support its conclusion that the contract had not been abandoned, but rather that Elsie had merely waived strict compliance with the contractual terms: Mark and Cloyd had, at all times, remained in possession of the land, and had continued to use the land in their farming and grazing business; even though all payments were not

made as required by the contract, Elsie never declared herself dissatisfied with the performance of the contract, nor did she ever declare the contract in default and attempt to terminate it.

Although the 1979 and 1980 conveyances might seem inconsistent with Elsie's intent to honor the 1966 contract,[2] it is clear that Elsie did not understand the inconsistencies but rather signed the documents to accommodate her children's wishes. The court found that the parties failed to show a clear unequivocal intent to abandon the contract, and thus found the contract to be in full force and effect. The trial court's findings of fact and conclusions of law based thereon, are consistent with other decisions in this jurisdiction, *see, e.g., Adair*, 745 P.2d at 851; *Tanner*, 612 P.2d at 347, and are not against the clear weight of the evidence.

Elsie's failure to take affirmative steps necessary to terminate the contract is further support of the parties' intent not to abandon the contract. The termination provisions of forfeiture clauses in real estate contracts are not self-executing. *See Johnston v. Austin*, 748 P.2d 1084, 1086 (Utah 1988).

■ The 1966 contract provided that if Mark and Cloyd failed to comply with the terms of the contract or failed to make payments as they became due, then Elsie, at her option could retake possession, and Mark and Cloyd were to peacefully abandon all property, and forfeit any and all payments previously made. This type of forfeiture provision is not self-executing, and it was incumbent upon Elsie, if she desired to exercise her option to terminate Cloyd's and Mark's rights, that she give them sufficient notice of her election to terminate the contract. *See Fuhriman v. Bissegger*, 13 Utah 2d 379, 375 P.2d 27, 27 (1962).

Appellants contend that even if the 1966 contract was not abandoned by the parties,

it was error for the court to specifically enforce the contract as Mark and the estate of Cloyd had not brought the payments on the contract current before trial. Appellants rely on the rule which requires the party desiring to use the legal process in seeking specific performance of a contract to make a tender of his own agreed performance in order to put the other party into default. *Century 21 All Western Real Estate & Inv., Inc. v. Webb*, 645 P.2d 52, 56 (Utah 1982); *Fischer v. Johnson*, 525 P.2d 45, 46–47 (Utah 1974).

This argument might be more persuasive if made by Elsie, the beneficiary of the performance due under the contract. Elsie has not raised this issue on appeal although she now has separate appointed counsel to represent her interests. Elsie is the only person who has standing to raise this defense in the context of this case. Furthermore, literal and exact performance by a plaintiff is not always necessary as a condition to securing specific performance of a contract by a defendant, *Albachten v. Miller*, 216 Or. 379, 339 P.2d 427, 430 (1959), especially when strict performance of the terms of the contract have been waived by the parties. *See Pack*, 667 P.2d at 40.

In this case, because the parties waived strict compliance with the payment terms of the contract, and because payments had not been routinely accounted for, the balance due under the contract from Mark and Cloyd's estate was uncertain. The trial court, when granting specific performance, required Mark and Cloyd's estate to pay Elsie over $50,000, which they have done. Elsie was not prejudiced or damaged by the trial court's award of specific performance. Thus, we find that the granting of specific performance was within the trial court's discretion. *See id.*

## COMPETENCY

■ The law will presume competency rather than incompetency, and will do so

---

**2.** A conveyance of title or of an interest in title subsequent to the owner's having contracted to sell the property is not necessarily an action inconsistent with the contract. Where the grantee has actual or constructive knowledge of

the contract, the grantee simply takes title subject to the buyer's right to acquire title on completion of the contract. In this case, however, it is not argued that the 1979 and 1980 conveyances were executed in this vein.

unless proof to the contrary is presented. *First Christian Church v. McReynolds,* 194 Or. 68, 241 P.2d 135, 137–38 (1952). Mental incompetency must be established by clear, cogent, satisfactory, and convincing evidence. *Binder v. Binder,* 50 Wash. 2d 142, 309 P.2d 1050, 1053 (1957); *Tate,* 217 P.2d at 185. The test whether a grantor has sufficient mental capacity to make a deed is whether the mental faculties were so deficient or impaired that there was not sufficient power to comprehend the subject of the deed, its nature and its probable consequences, and to act with discretion in relation thereto. *Peterson v. Carter,* 579 P.2d 329, 331 (Utah 1978). The capacity is measured at the time of the execution of the contract. *Uribe v. Olson,* 42 Or.App. 647, 601 P.2d 818, 820 (1979). Neither old age, sickness nor extreme distress incapacitates a party from disposing of his property if he has possession of his mental faculties and understands the business in which he is engaged. *Uribe,* 601 P.2d at 820; *Harris v. Rivard,* 64 Wash.2d 173, 390 P.2d 1004, 1006 (1964).

■ There is scant evidence in the record to support the trial court's unsolicited determination that Elsie was incompetent. While there is evidence that Elsie was old, and that she had complete trust in her children and grandchildren, to the point that she would sign virtually anything asked of her, there is no evidence that she was unable to understand the nature of the proceedings or was unable to transact business. While the trial court erred in finding Elsie incompetent, such error was harmless and non-prejudicial. We agree with the trial court that there is sufficient evidence that Elsie lacked the requisite intent to transfer her property when she signed the 1979 and 1980 conveyances. She signed the documents as a result of influence exerted upon her by her children and grandchildren, in an apparent attempt to please them.

When a deed is executed with no intent to transfer a present interest in property, it is invalid. *Baker v. Pattee,* 684 P.2d 632, 635 (Utah 1984). Courts have consistently held that a conveyance is valid only upon delivery of a deed with the present intent to transfer. *Baker,* 684 P.2d at 635. Intention is the essence of delivery and is of primary and controlling importance. *Lenhart v. Desmond,* 705 P.2d 338, 342 (Wyo. 1985). The grantor's present intent must be to pass his or her title interest to the grantee and divest himself of the same; otherwise the purported deed is not valid or effective. *Den–Gar Enter. v. Romero,* 94 N.M. 425, 611 P.2d 1119, 1122 (Ct.App. 1980).

■ The facts surrounding the execution of the deeds in 1979 and 1980 indicate that Elsie lacked the necessary intent to transfer property. This is illustrated by Elsie's response to several questions at trial:

Mr. Bishop: When you signed [the 1979 joint tenancy deed] was it your intent to cancel the contract with Cloyd and Mark?

Elsie: Never.

Mr. Bishop: Was it your intent to change the contract with Mark and Cloyd?

Elsie: No. I never had. Why should I? I never had any trouble with them.

. . . . .

Mr. Bishop: At the time [the 1980 warranty deed] was brought to you, did you read it?

Elsie: No, I didn't read it, he just said— Well I said, "Oh you came early in the morning," and he says "Here grandma are some papers I'd like you to sign," and I says, "What's that for," and he says "oh, to see if we can get a little money for you."

Mr. Bishop: Did anybody read it to you before you signed it?

Elsie: No.

Mr. Bishop: Why did you sign it?

Elsie: Because he brought it and said he wanted me to sign it, and I didn't know what the deal was. They never asked me anything about it.

The facts clearly support the trial court's findings that Elsie did not have the necessary intent to transfer her property when she executed the 1979 and 1980 conveyances. Elsie signed the documents as a result of her children's and grandchildren's influence, which overcame her free will. *See*

*Binder,* 309 P.2d at 1054; *Tate,* 217 P.2d at 186.

■ A child having a confidential relationship with a parent has a duty to act fairly, to make disclosures of material information, and to take no unfair advantage. *See Seequist v. Seequist,* 524 P.2d 598, 599 (Utah 1974). Undue influence need not be exerted with bad intentions, or self-interest in mind, but may well be an honest overzealousness engendered by good motives. *Walker Bank & Trust Co. v. Walker,* 17 Utah 2d 390, 412 P.2d 920, 922 (1966). There must only be a showing of a reposal of confidence by one party and the resulting superiority and influence on the other party. *Bradbury v. Rasmussen,* 16 Utah 2d 378, 401 P.2d 710, 713 (1965).

The trial court, in determining that Elsie was unduly influenced, made the following findings:

19. The Court finds that all of the children and certain grandchildren of ELSIE J. BRINKERHOFF, from their respective view points, and because of what they perceived as being others taking advantage of their mother or grandmother by such other parties, used their own influence to convince Elsie Brinkerhoff to execute documents and take legal positions in order to accomplish what they, the children and/or grandchildren or other relatives, thought was for Elsie Brinkerhoff's best interest.

20. The Court finds that the children and grandchildren who prevailed upon Elsie Brinkerhoff to execute documents and take legal stands after 1970 did not intend to take advantage of her for their own purposes. Nevertheless, they did take advantage of Elsie Brinkerhoff for the purpose of benefiting her in their own minds, from their own points of view. As a result, those persons of who persuaded and induced Elsie Brinkerhoff to sign contractual, legal, and financial documents, including deeds, and to take certain legal positions from and after 1970 used improper constraint of urgency of pursuasion [sic], whereby the will of Elsie Brinkerhoff was overpowered, and she was induced to do or forebear an act which she otherwise would not do, or otherwise would do if left to act freely.

21. The unfair persuasion of Elsie Brinkerhoff on various occasions from and after 1970 generally took place in private. The persons persuading her to sign legal and financial documents were able to obtain her signature because of her age, psychological dependency, and existing confidential and/or family relationships.

22. The transactions leading to the signing of financial and legal documents by Elsie Brinkerhoff were initiated by her family members, not by herself, under circumstances in which Elsie Brinkerhoff lacked reasonable access to independent, non-confidential advice.

The trial court's findings are supported by ample evidence and accordingly we affirm.

Inasmuch as we find no evidence to support the conclusion that Elsie was incompetent, we need not address the question of whether the trial court erred in continuing the trial after determining Elsie was not competent without appointing Elsie a guardian ad litem. There is no evidence that Elsie was deprived of any meritorious defense, nor is there evidence that she has been misled or in anyway deprived of any benefit she would have received through the assistance of a guardian ad litem. *See Whitney v. Walker,* 25 Utah 2d 202, 479 P.2d 469, 471 (1971). Furthermore, Elsie does not appeal the decision of the trial court even though the court, after the trial, appointed a lawyer to represent her post-trial interests.

Affirmed.

GARFF AND ORME, JJ., concur.